## APOLINARIO HERNANDEZ v. THE STATE.

### No. 2842.   Decided June 25, 1904.

**1.—Jury and Jury Law.**

Questions in regard to the manner of selecting and impaneling jurors must be raised at the time of the action taken; they can not be urged by motion for new trial for the first time, unless they go to the class of jurors who are incompetent.

**2.—Same—Objections to Jurors Must Be Made in Limine.**

Where there were no jurors drawn at a regular term of the district court on account of the fact that no term of the court was held at that time because of the prevalence of yellow fever in that section, and objections to the jury who tried defendant were not raised until after conviction in the motion for new trial, the objection came too late.

**3.—Charge of the Court—Circumstantial Evidence.**

Where the statement of the deceased that defendant had shot her were made a short time after the shooting and shortly before her death, they were either as res gestæ or dying declarations direct evidence, and made it unnecessary for the court to charge on the law of circumstantial evidence.

**4.—Same—Murder in the Second Degree.**

Where the evidence is sufficiently strong to exclude any theory of murder in the second degree, and to manifest, to the exclusion of murder in the second degree, a killing upon express malice, it is not error to fail to charge the law of murder in the second degree.

Appeal from the District Court of Nueces.   Tried below before Hon. Stanley Welch.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*Geo. W. Westervelt* and *D. McManus*, for appellant.—On question of selecting jury:   Bates v. State, 4 Texas Ct. Rep., 692.

It is only where the evidence is positive and uncontroverted that the killing was done deliberately, with a sedate mind, and in pursuance of a formed design to kill, that the trial court is justified in omitting to charge on murder in the second degree.   Moore v. State, 40 Texas Crim. Rep., 389.

In prosecutions for murder, it is the trial court's imperative duty to instruct upon murder in the second degree, if by any possible legitimate construction of the evidence the jury might convict of a lower degree than of murder in the firse degree.   Jones v. State, 29 Texas Crim. App., 338; Lancaster v. State, 31 S. W. Rep., 515.

Where the record is silent as to what was said and done at the crucial moment, the time of the homicide, and no eyewitnesses testify as to the immediate circumstances that environ the killing, or where the facts surrounding the homicide are to be deduced from circumstances alone without any evidence as to the condition of defendant's mind at the time of the killing, a charge on murder in the second degree is demanded, and it is error to omit such charge under such circumstances.

Moore v. State, 40 Texas Crim. Rep., 439; Bennett v. State, 39 Texas Crim. Rep., 639; Blocker v. State, 27 Texas Crim. App., 16; Benavides v. State, 14 Texas Crim. App., 378; Connor v. State, 23 Texas Crim. App., 378; Barth v. State, 39 Texas Crim. Rep., 381; Trejo v. State, 7 Texas Ct. Rep., 906.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—For the murder of his wife appellant was awarded the death penalty. There is a question raised on motion for new trial in regard to the special venire, in that there was a failure to appoint jury commissioners at the previous term of the district court. The allegation in the motion for new trial is that there were no jurors drawn at the November term, 1903. There was no term of the court held at that time on account of the prevalence of yellow fever in that section. No question was raised in regard to this matter until after the conviction. Questions in regard to the manner of selecting and impaneling jurors must be excepted to at the time of the action taken. It is too late to suggest it by motion for new trial except under certain contingencies, wherein the statute provides that certain class of jurors are incompetent under all circumstances. That question, however, is not in this case.

There are two questions suggested in the motion which require discussion: (1) the failure of the court to charge the law applicable to circumstantial evidence; and (2) the failure of the court to charge upon murder in the second degree. The facts show that appellant had been very cruel to his wife; that he ill treated, abused and inflicted personal violence upon her to such an extent that she left home and returned to the parental roof. The final separation occurred about two months before the homicide. Her father testified that on this occasion he was at the residence of appellant and deceased; found his daughter had been badly treated, beaten and bruised, and was bleeding considerably. In the presence of appellant he inquired of his daughter the cause, and was informed appellant had inflicted the injuries. She returned home with her father. On repeated occasions at the solicitation of appellant she refused to return to his home or in any manner to live with him. This enraged and angered him very much. On one or more occasions he was noticed about the residence of his father-in-law, and once especially at night loitering about the premises. He uttered repeated threats to take her life if she refused to live with him. All of the testimony shows she was very much afraid of appellant. The evening before the homicide he rode in a wagon with two of the witnesses from the town of Alice to Bluntzer's pasture, in which lived his sister and also his father-in-law, and his wife. He was armed with what the witnesses called "a black carbine," 44-caliber. On the morning of the homicide his father-in-law was working in one part of the field and appellant's wife in another, some distance away. Two shots were heard by several of the witnesses,

At first no attention was paid to it. Subsequently it was found that these two shots were fired into the body of appellant's wife, one going in the back and the other in the breast. Upon reaching the scene of the tragedy deceased was still alive. When the father reached his wounded daughter, he picked her up, and said, "What is the matter, Negrita (little negro) [Negrita is a nickname I had for her], and she replied, 'I am dying, father.' I asked her, 'Who has wounded you?' and she replied 'Polo.' Defendant's name is Apolinario, but he was always called 'Polo' by us, for short." About that time her brother Pancho arrived, and was sent immediately for the constable, Mr. Quinn. When he arrived deceased was still alive. Quinn asked deceased who had shot her, and she answered, "Polo." Quinn asked "Who" and deceased answered, "Apolinario, my husband." She lived about an hour or an hour and a half after her father reached her. Two empty cartridge shells of 44-caliber were found some thirty or forty steps from where deceased was lying when reached by her father. Where she was discovered and for some thirty or forty steps there was blood and a trail of blood as if she had traveled that distance after being shot. Pancho Silva, after testifying to the troubles between appellant and deceased, and the wounds and the blood from the blows on her head, testified he saw defendant dodging around his father's place prior to the death of his sister, and saw him once lurking there at night. In regard to the immediate physical facts on the ground this witness testified he noticed the blood from where his sister was lying to a point thirty or forty yards away; and there he found a pool of blood; and continuing on from this point about ten or fifteen feet distance from the blood he found where the tracks of the party doing the shooting began. At this point he found two empty brass cartridge shells, caliber 44. These were produced in court. Flores testified that on one occasion, after the separation of appellant and his wife, appellant came to the field where his wife was, spoke to her and tried to get her off to one side; she refused, and he left. Not long after this deceased was at the residence of witness, when defendant suddenly appeared and stood in the door with a knife in his hand. He asked deceased if she was going to return and live with him. She replied that she never would live with him again, as he had beaten and ill treated her. Appellant swore at her and used a great deal of bad language. This witness finally ordered appellant away from his residence. This was about two weeks before the homicide. He told the witness Garza that he had been urging his wife to return and live with him; that he wanted her; that he loved her so much that if she did not return and live with him he would kill her. This conversation occurred about a month prior to the homicide. On the morning of the killing witness Abrigo was in the woods collecting firewood. Just as he reached to break a limb from a tree he heard a noise as of some one coming through the brush; turning he saw defendant. He was near witness at the time and had a carbine in his hand. As appellant saw witness he raised his gun and pointed it in the direcetion of witness, and said, "Get

out of the way, you old son of a bitch; I have one on my spurs already, and have four more shots here for you." Witness immediately ran away and went home. This was about 9 or 10 o'clock in the morning. Appellant was coming from the direction of the field of the father of deceased at the time and was afoot. Appellant was arrested at Alice a day or two after the homicide, and was sitting in the house of another Mexican with his carbine by his side. Alice seems to have been about twenty miles from the scene of the homicide. Under this state of facts we are of opinion that neither proposition urged by appellant for reversal in regard to the omission in the charge is well taken. The statements of deceased, whether regarded as res gestæ or dying declarations, relieved the court of the necessity of charging the law of circumstantial evidence. This is an emphatic statement that appellant shot her.

There is perhaps more trouble in regard to the failure of the court to charge the law applicable to murder in the second degree. We recognized the rule as being sound that before a court will be justified in failing or refusing to charge the law applicable to murder in the second degree, the facts must be of such a cogent character not only to constitute murder in the first degree, but to exclude murder in the second degree. Of course we are not discussing a killing in the perpetration of robbery, and those matters which are made by the statute per se murder in the first degree. All of the constituent elements of murder in the first degree are abundantly shown by the facts; and in our judgment to such an extent as exclude all inferior degrees of homicide. Malice and grudges, menaces and ill will and threats are abundantly shown and are uncontradicted. The physical facts on the ground show that the nearest point to which appellant approached his wife was ten or fifteen feet. It is evident that from this point he fired two shots into the body of his wife, one entering her back and the other her breast, from which blood seemed to have copiously flowed. There was no struggle between them; nor, as before stated, did he approach nearer than ten or fifteen feet. He went to her in the field away from the remainder of the family and out of view, and sought this occasion to execute his threats. Leaving that point he was seen by the witness Abrigo, on whom he presented his gun and used the expression heretofore mentioned. We are of opinion, therefore, that this evidence is sufficiently strong to exclude any theory of murder in the second degree, and to manifest, to the exclusion of murder in the second degree, that it was a killing upon express malice. The judgment is affirmed.

*Affirmed.*