[No. 2269.]

BEN HART *v*. THE STATE.

1. PRACTICE—EVIDENCE—FLIGHT of the accused after his indictment and release on bail is a fact which may be proved by the State in cases either of positive or circumstantial evidence.
2. THEFT—CHARGE OF THE COURT.—See the opinion *in extenso* for instructions of the court in a theft case *held* correct, both in the abstract and in their applicability to evidence of a purchase by the defendant, and of his explanation of his possession of the stolen property.
3. SAME—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for theft.

APPEAL from the District Court of Hopkins. Tried below before the Hon. J. A. B. Putman.

The conviction was for the theft of a mare and colt, the property of V. T. Cummings, in Hopkins county, Texas, on the eighteenth day of August, 1885. A term of five years in the penitentiary was the penalty assessed by the verdict.

V. T. Cummings was the first witness for the State. He testified that he lived at Sulphur Springs, Hopkins county, Texas. He owned the mare and colt described in the indictment, which animals ran on the range in Hopkins county, about seven miles west from Sulphur Springs. The mare was sorrel in color, with flaxen mane and tail. She had some white in the forehead and two white feet. She was about four years old, unbroken and unbranded. Her colt was a yearling. They were both in the witness's possession, though running on the range, and were taken from that possession without his knowledge or consent about the last of July or first of August, 1885.

Cross examined, witness testified that he lived in Hopkins county for about twelve years prior to 1882, when he moved to Trinity county. He left his horses and cattle stock in the care of J. P. King and Aus. Hughes. Witness returned to Hopkins county late in July, 1885, and, concluding to make it his residence, went back to Trinity county to get his wife. Before going back for his wife witness got Hughes to go on the range and point out his horses to him. Hughes pointed out the sorrel mare and colt, and witness resumed control of them, and they

were never afterwards in the care, control or management of either King or Hughes. The animals were left on the range. Nothing was said about Hughes delivering them to witness. The witness returned to Hopkins county on either the sixth or eighth of August. Witness then hired a young man to break the mare and witness worked on Hughes's place for Hughes to go with the young man to get the mare. They failed to find her. Afterwards the witness and Aus. Hughes went to Daingerfield in Morris county, where they found the mare and colt in the possession of J. T. Jones. Jones went with witness back to Hopkins county, and to see the defendant. Witness told defendant that the mare and colt belonged to him, witness. Defendant replied that he bought the animals and had a bill of sale for them, but would pay witness for them if they actually belonged to him. Defendant paid the witness seventy-five dollars, which was about what they were worth. He did not exhibit a bill of sale, nor did he say from whom he bought them.

J. T. Jones testified, for the State, that he lived in Morris, county, Texas, about sixty-five miles east of Sulphur Springs. Witness bought the animals described in the indictment from the defendant, receiving them on the eighteenth day of August, 1885, at Lanier's pasture, in Hopkins county, Texas, nine miles west from Sulphur Springs. Messrs. Cummings and Hughes subsequently came to Daingerfield, and the former claimed the animals. Witness returned to Hopkins county with them and went to see defendant at that time clerking in Denton's store. He told defendant that Cummings claimed the animals. Defendant said that if Cummings knew the animals to be his, he would pay for them; that he bought them without seeing them from one J. P. Clark, and gathered them by the bill of sale. Defendant paid Cummings seventy-five dollars for the mare and colt. Witness bought twenty head of horses at the time he bought the animals described in the indictment, paying twenty-two dollars per head, the colt being thrown in.

Cross examined, witness testified that he contracted with defendant for the purchase of a lot of horses on July 28, 1885. On the eighteenth of the following August the defendant delivered to witness twenty head, at Lanier's pasture. The lot did not exactly comply with the contract as to quality, and defendant threw in the colt. The contract between witness and defendant was publicly made and was generally known. Defendant and witness, in July, went to see some of the horses to be delivered

under the contract, and it was the recollection of the witness that defendant pointed out the mare and colt as his property.

J. P. King was the next witness for the State. He testified that he knew the mare and colt described in the indictment. The mare grew up on the prairie near the house in which the defendant had lived nearly all of his life. Witness knew when the defendant gathered and penned in Lanier's pasture the horses he sold to Jones. Witness had a conversation with the defendant about September 1, 1885, in which he described the Cummings mare and colt, and asked defendant if he had seen any thing of them. He said that he thought he knew the mare and colt, and that he thought he had seen such animals in Lanier's pasture; that they were possibly among those which did not belong to him, and which he penned with those he sold to Jones; and, if so, he would turn them out. Witness told him to see if they were then in Lanier's pasture, and, if so, to let them stay. Witness and Aus. Hughes, on their way to Sulphur Springs, afterwards met the defendant going from town towards Lanier's pasture. Witness then asked defendant if he had seen any thing of the Cummings mare and colt, and he said that he had not. Witness replied: "Mrs. Ishmael says that Joe Gofford, or some body else, has gotten away with her." Defendant, if he said any thing, made some slight reply, disclosing nothing. The witness observed nothing unusal about his appearance or deportment. About that time Joe Gofford joined the party. Witness and Gofford got into a conversation and defendant and Hughes conversed. Witness saw the defendant after Hughes and Cummings got back from Daingerfield, and defendant told witness that he bought the mare and colt from a man who lived east of Sulphur Springs. If he mentioned the man's name witness did not hear it.

Cross examined, the witness said that he supposed there were other sorrel mares on the prairie besides that of Cummings. It was a matter of general notoriety that the defendant was gathering horses before he sold the bunch to Jones. Witness had taken care of Cummings's stock for a time, but had no control over them in the summer or fall of 1885.

Aus. Hughes, testifying for the State, corroborated King as to the conversation with defendant about the mare and colt, on the highway between Sulphur Springs and Lanier's pasture. Witness had no care of, or control over, the mare and colt after he pointed them out to Cummings, on the prairie, in July, when

Cummings first came back to Hopkins county. Witness went with Cummings to Daingerfield and found the mare and colt in the possesion of J. T. Jones. The State closed.

John Moncrief was the first witness for the defense. He testified that he and the defendant and the Coyle boys were on the prairie together in the summer of 1884, and met a man named Clark, who said that he was hunting five head of horses, which he described. Three of them, he said, were sorrel mares. Two of them, he said, had colts, and one, he said, had flaxen mane and tail and white hind feet. He said that the mares were unbranded. Defendant told Clark that he had seen such horses. The party rode over the prairie until defendant found and pointed out a bunch of horses, which Clark claimed, and which he traded to defendant, executing a bill of sale. Clark was a man about thirty-five years old, of medium height, would weigh about one hundred and sixty pounds, and wore a light sandy beard. Witness never saw Clark before, and has never seen him since.

W. S. White testified, for the defense, that he had lived in Hopkins county for twenty years or more. During the last three or four years he had known a horse trader named Clark, who lived somewhere in or towards Wood county. Witness had not seen Clark for a year or more. Clark claimed to own horses running in Hopkins county and witness had often seen him on the range looking after horse stock. Clark was a man between thirty-five and forty years of age, was medium sized, would weigh between one hundred and sixty-five and one hundred and seventy pounds, and, if he wore beard at all, it was of a sandy color. Witness did not know Clark's present whereabouts.

James Smith testified, for the defense, that he helped the defendant gather the horses he sold to Jones. Among the animals was a sorrel mare which, after examining and pronouncing her to be too light of color to be his, the defendant turned out. Defendant then got up the mare described in the indictment, which he had bought about a year before and sold her to Jones.

The defense next introduced in evidence a bill of sale, which reads as follows: "Knowing all men by these present, that I this day, August 8, 1884, sell and deliver to Ben Hart the following described horses: One light sorrel mare, five or six years old, white in face and some white feet, no brand, has a young colt. One sorrel mare, five years old, no brand, left hind foot white,

has a colt.  One sorrel mare, four years old, no brand, left foot white.                                         J. P. CLARK."

James Houston testified, for the defense, that J. T. Jones employed him and some of his hands to receive certain horses at Lanier's pasture, which he had purchased from defendant, and to drive them to Daingerfield.  This was in August, 1885.  Witness received those horses from defendant in the presence of a large number of people, several of whom were stock men.  He drove those horses along the public highway into and through the town of Sulphur Springs, keeping them over night in his lot in said town.  The bunch of horses included several sorrel mares, one of which had a flaxen mane and tail, and white hind feet.  On witness's return to Hopkins county, Mr. Hughes asked him about such a mare as that last described, and said that Cummings had lost such an animal.  The witness reported what Hughes said to Hart, and Hart said he bought the mare from a a man named Clark, who lived on Burke's creek, in the southwest part of Hopkins county.  The defense closed.

In rebuttal the State read in evidence the forfeiture of the defendant's recognizance for one thousand dollars, at the previous term of the court.  The sheriff testified to the forfeiture of the defendant's recognizance, the issuance of *capias* for his arrest, and his failure to apprehend the defendant until about two months prior to this trial, when he found him in custody in Hunt county.

The motion for new trial raised the questions discussed in the opinion.

*E. B. Perkins* and *Leach & Templeton,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE.  This is an appeal from a conviction for the theft of a mare and colt, alleged to be the property of V. T. Cummings.

The State, over the objections of defendant, proved that defendant forfeited his bail bond.  Appellant contends that proof of flight is admissible only in cases in which the State relies upon circumstantial evidence for a conviction, citing Williams v. The State, 43 Texas, 182.  This court holds to the contrary, that is, that flight by a defendant is admissible in all cases, whether the evidence be circumstantial or direct.  (Black v.

The State, 3 Texas Ct. App., 581.) The court charged the jury that the taking of property under an honest claim of right can not constitute theft, though the party may be mistaken in his claim, and the intent with which an accused acted, whether an honest intent or a fraudulent intent, is a question of fact for the jury to determine from all the facts and circumstances *established* by the evidence. To this charge defendant objects, because it instructs the jury to consider only such facts and circumstances as are *established* by the evidence, and not all the facts and circumstances in proof. We can see no practical difference between the two propositions. If facts and circumstances are *in proof*, certainly they are established by the evidence. Proof is the result of evidence. A fact established by the evidence is in proof, and such fact is the result from the evidence established by it.

The court charged the jury if some other person stole the mare and colt and took them into actual possession, and that defendant did not assist in such actual taking, but afterwards purchased said mare and colt and received possession of them from the person who stole them, the defendant would not be guilty of theft although he may have known that his vendor had stolen them. To this charge it is objected that there was no evidence tending to show that any person had stolen the horses, or had ever had actual possession of the same. We will discuss this part of the charge in connection with another proposition urged by appellant, to wit: "In case of theft, where the defendant claims the property under claim of purchase, it is immaterial whether he purchased the property in good or bad faith." This proposition may or may not be correct, depending upon other facts. If defendant obtained possession of the property from some other person with or without purchase, in good or bad faith, with or without knowledge that it was stolen, he can not be convicted of theft. But suppose defendant took the property from the possession of the owner, and to justify the trespass—the taking—he relies upon a purchase from some other person. In such a case it is of the first importance whether defendant acted in bad faith. For, if he knew the person from whom he purchased had no right to sell, and that the sale was a fraud upon the rights of the owner, a taking under such circumstances, though he had purchased the property, would be fraudulent, as much so as if there had been no purchase.

By reference to the statement of facts it will be found that the

charge complained of was demanded by the evidence, and, hence there was no error in the charge. The court charged the jury the rule applicable to a case of recent possession, with reasonable explanation. There is no objection urged to the rule as stated by the court, but it is insisted that the court should have made a direct application to the facts bearing upon this matter; and in support of this position we are cited to Windham's case, 19 Texas Court of Appeals, 422; Miller's case, 18 Texas Court of Appeals, 34; York's case, 17 Texas Court of Appeals, 441; Richardson's case, 7 Texas Court of Appeals, 499, and Francis's case, 7 Texas Court of Appeals, 514. We have examined each of these cases, and find none of them support the position of appellant. When the rule is stated clearly and correctly upon the question of recent possession, we have found no case in which it is held that there must be a direct application of the rule to the facts.

That part of the charge in which the rule is stated is very clear and simple, and there can be no doubt but that its application to the facts bearing upon this subject was thoroughly understood by the jury.

The charge is as follows: "When a person found in possession of property recently stolen, when first found in possession of it or when his title thereto is first called in question, gives a reasonable and probable explanation consistent with his innocence, such explanation rebuts the presumption of guilt arising from such recent possession, and it devolves upon the prosecution to show that such explanation is false." It would be a dangerous doctrine to require the court to conclude this charge with instructions to the jury to acquit if the State failed to show the explanation of defendant to be false, because it is a rare case in which there are no other criminative facts except recent possession with reasonable explanation; and, while it may be true that other criminative facts would tend to disprove the apparently reasonable explanations made by defendant, yet the jury might conclude that the State should, by direct evidence, refute the explanations, and failing in this the defendant would be entitled to an acquittal. If, however, the inculpatory facts consisted alone of recent possession with reasonable explanation, it would be proper to so charge the jury.

We have read with interest the close and very plausible argument of counsel for appellant in support of the proposition that the evidence is not sufficient to support the verdict. But, after

a careful examination of the statement of facts, we do not think we would be warranted in reversing the judgment upon this ground.

We have found no such error in the judgment as will require a reversal thereof, and the same is affirmed.

*Affirmed.*

Opinion delivered December 11, 1886.