LOUIS TINDALL V. THE STATE.

No. 22368.   Delivered February 24, 1943.
State's Motion for Rehearing Granted March 31, 1943.
Appellant's Motion for Rehearing Overruled June 25, 1943.

The opinion states the case.

*Mays & Mays, Marvin Simpson, Jr., Chas. T. Groce, W. E. Myres,* and *Byron Matthews,* all of Ft. Worth, and *Hughes & Monroe,* of Dallas, for appellant.

*Marvin H. Brown, Jr.,* Crim. Dist. Atty., *M. Hendricks Brown,* Asst. Crim. Dist. Atty., and *Will R. Parker,* all of Fort Worth, and *Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

KRUEGER, Judge.

Appellant was convicted of the offense of an assault with intent to murder and his punishment was assessed at confinement in the State penitentiary for a term of two years.

Appellant challenges the sufficiency of the evidence to sustain his conviction.

The State's testimony, briefly stated, shows that the injured party was the mother-in-law of appellant and was living at his home on the night of the alleged assault and had been living at his home continuously for twelve years up to the time of the alleged assault. Appellant, who had been in the hospital where he was treated for an ulcerated stomach, returned to his home on the night in question. Upon arriving there he found the doors to his home locked, but through the glass of a door he saw his mother-in-law and her grandchildren sitting in a room. He asked her to open the door, but she was somewhat dilatory in complying with his request, whereupon he broke the glass out

of the door, reached through the broken glass, opened the door and entered the house with two pistols. This produced considerable consternation and caused the wife of appellant and his daughters to make a hurried retreat by way of a back door while the mother-in-law, who had obtained a pistol, was attempting a rear-guard action to enable the wife of appellant and his daughters to make their escape. Appellant and his mother-in-law then proceeded from the rear of the house to the front porch and out into the yard where he fired several shots into the ground and told her to go back into the house; that when she was complying with his demand, he kicked her down near the door, commanded her to give him her pistol, which she did, and then struck her on the head with a pistol, inflicting a small scalp wound; that she then threw her hands and arms over her head and he struck her again, breaking both bones of one arm; that during the assault he stated that he was going to kill her. On cross-examination by appellant's counsel, she testified that she did not know whether he shot at her or not; that he could have shot her, as there was nothing to prevent him from killing her. He just said, "He was going to kill me by degrees"; that immediately after she had received the injuries he summoned a doctor to treat her.

Much testimony was introduced relative to appellant's relations with a blonde woman, the accidental discharge of a pistol in his room while he was confined in the hospital, and his intent to defraud his wife, who had instituted a suit for a divorce and partition of property by withdrawing $1,800.00 from a bank.

Appellant testified in his own behalf and denied any intent to kill his mother-in-law. He also denied that he struck her with a pistol. He testified that she broke her arm and cut her scalp when she fell from the porch.

In view of the disposition we are making of this case, we do not deem it necessary at this time to express an opinion as to the sufficiency of the evidence to justify and sustain his conviction of an assault with intent to murder, further than to say that we entertain serious doubt thereof.

By Bill of Exception No. 1 appellant complains of the admission of the testimony given by Mrs. Callahan, the injured party, as follows: "I turned and started to run back into the house, and then he shot. Of course, I don't know whether he was shooting at me or not, but he shot, I thought, about four times. The bullets hit right around my feet. I went back there

about ten days later and saw the holes in the ground where the bullets had gone down in the ground."

Appellant objected to this testimony on the ground that it calls for a conclusion of the witness. We are not in accord with his contention. The fact that appellant shot about four times was admissible as a part of the res gestae. The objection, as it relates to the balance of her testimony, went to the weight rather than to its inadmissibility.

Bills of Exception Nos. 2, 3 and 7 reflect the following occurrences: While appellant was being cross-examined by the State, he was asked: "When this case was set for trial along in the early part of the month you didn't appear to answer to this charge, did you?"

To the question and answer sought to be elicited appellant objected on the ground that it was irrelevant, immaterial and prejudicial. The objection was overruled and he was required to answer the question. He testified: "I was in the hospital." Thereupon, the further question was propounded to him: "You mean you were sick?" to which he replied: "Yes, sir." The court qualified this bill, but we do not deem it necessary to here set out the qualification in detail. However, the substance of the qualification is that appellant did not appear when the case was originally set for trial on May 27, 1942; that appellant's attorneys did appear and advised the court that it was their understanding that he was in the hospital. The court then took a recess to enable the State and defendant's counsel to make an investigation as to his physical condition, and the next day two physicians appeared in court and stated that in their opinion appellant was not physically able to appear, whereupon the case was postponed until the latter part of June. In view of the qualification showing that the court had theretofore determined that appellant was not physically able to appear at that time and had postponed the case, therefore, the evidence failed to prove or disprove any issue in the case, unless it could be shown that appellant had perpetrated a fraud upon the court. The only purpose, as we see it, was to convey to the jury the idea that appellant evaded trial, knowing that he was guilty. However, this issue had been decided theretofore by the court when the case was postponed. We are of the opinion that the learned trial court fell into error in admitting the same.

Bills of Exception Nos. 5 and 6, as qualified by the court, show that the State, on cross-examination of appellant's wit-

ness, Lee Rogers, was permitted to ask him the following question:

"Q. You stated to the jury that you had never had any business with this defendant. You remember when his wife sued him for divorce, right just about the time of this trouble with his mother-in-law, don't you? A. Yes.

"Q. You came to Ft. Worth with him and went with him out and woke the banker up to get $1,800.00 out of the bank to keep his wife from catching it by tying it up and getting her part? A. I don't remember exactly what time it was when he went to the banker's house, but I'll say it was anywhere from eleven at night until one in the morning. The purpose of my visit with the defendant to the banker's house at that time of the night was to get $1,800.00 out of the bank before his wife could serve process on the bank to keep him from getting it."

This testimony, in our opinion, was foreign to any issue in the case and manfestly irrelevant and highly prejudicial. We are frank to admit that we are at a loss to understand why or on what theory it was admitted.

The matter complained of in Bill of Exception No. 8 fails to reflect any reversible error because appellant, on cross-examination of Mrs. Callahan, first elicited from her the fact that a blonde-headed woman by the name of Opal Boyer was at the hospital and claimed to be appellant's wife. Appellant having first opened the subject, he cannot complain when the State, on cross-examination of him, explored the subject further.

Bill of Exception No. 10 shows that Mrs. Callahan, while being cross-examined, made a lengthy reply to a simple question, which was not responsive thereto. However, the court sustained appellant's objection and instructed the jury to disregard the same. Her answer that appellant was engaged in running a policy game, was shown on his cross-examination when the State inquired of him if he was not then under an indictment charging him with operating a policy game, to which he replied in the affirmative.

The matters complained of in Bills of Exception Nos. 11 and 12 relate to the argument of State's counsel, but since they will most likely not arise again upon another trial, we pretermit a discussion thereof.

For the errors herein discussed, the judgment of the trial court is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON STATE'S MOTION FOR REHEARING.

GRAVES, Judge.

In our original opinion we decided that the trial court fell into error in admitting the testimony shown in bills Nos. 2, 3 and 7. That portion of the opinion has been attacked by the State as erroneous. It is shown that the factual portion of such bill is in question and answer form with no certificate of the trial court that same was necessary.

The bill shows that the trial court on May 27th called this case for trial. Prior to such time, the court states he had been informed several days previously that the appellant would not be present for trial. Upon the calling of such case appellant failed to appear, but the manager of Baylor Hospital at Dallas, being present in court, informed the court that on the previous night, March 26th at 11:30, appellant appeared at the hospital, and had asked and received admittance. Appellant's bond was thereupon forfeited, and later in the day he made a new bond. On the following day, May 28th, appellant again failed to appear when his case was called, and he was then found in his room at the Blackstone hotel in Fort Worth. A doctor was sent there to examine him, and returned saying that he was too sick to stand trial at such time. However it was shown by appellant himself that on May 27th, the day he first failed to appear in court, that he went out to Jack Wilderspin's house, and that he also went out to Jack Walton's Barbecue Stand, and that he went to a tourist camp in the vicinity of the barbecue stand, all on various roads out of Fort Worth. The only question objected to in the bill of exceptions was: "Now, when this case was set for trial along the early part of the month, you didn't appear here to answer to the charges, did you?" To which question appellant finally answered: "No, sir. I was in the hospital. Q. You mean you were sick and unable to attend court? A. I guess I was."

This matter referred to the first time this case was called for trial on May 27th; that before the visits above outlined appellant presented himself at the hospital in Dallas and was admitted. The next day, when appellant was found sick in his room at Fort Worth, was when the court postponed his case, and none of the trips complained of in this bill took place after

the court had finally granted a postponement until June 23, 1942, when this trial was had.

That the accused forfeited his bail bond may be proved as tending to show flight. See Lingo v. State, 35 S. W. (2d) 153; Branch's Ann. Penal Code, Sec. 135; Hart v. State, 22 Tex. App. 563, 3 S. W. 741; Brown v. State, 57 Tex. Cr. R. 570, 124 S. W. 103; Dickens v. State, 53 S. W. (2d) 41; Gent v. State, 57 Tex. Cr. R. 414; 123 S. W. 594; Arnold v. State, 74 Tex. Cr. R. 269, 168 S. W. 122.

That appellant was driving around in the city of Fort Worth after his trip to the Dallas hospital at 11:30 at night, and just after the forfeiture of his appearance bond on the next day, May 27th, was introduced under the above authorities, and we think the same was admissible. It should be remembered that this was the first day that appellant failed to appear, not on the date of May 28th, such being his second failure, and the one upon which the postponement was granted.

Bill No. 3 is in question and answer form, and nowhere therein is it certified by the court that same was necessary. In fact the court in his qualification thereto refuses to thus certify.

Bill of exceptions No. 4 relates to a statement by certain peace officers relative to going to a room in the Baylor hospital and there finding appellant in possession of a pistol, and to the finding of a fired bullet in such room. This was shown to have occurred prior to the alleged assault complained of herein, and on the same day. It is shown in answer to appellant's complaint in this bill that the witness Miss Flora Moore, a nurse in such hospital, had testified to the same transaction as these officers were asked about, and there was no objection made to her testimony.. She testified, in substance, that she was attending appellant as a nurse when a gun was fired in this room; she went to the room, and they "laughed it off"; but later on in the same afternoon she asked him "Now seriously, why did you fire that gun?" and appellant answered, in substance, that he wanted to see if it worked; that he had intentions of settling some business about killing his mother-in-law, and that he was expecting her; that she had phoned up there and told him she was coming out for a visit. He said he wanted to see if the gun worked, so it would be sure and work when she walked in the door." There was no objection to Miss Moore's testimony. The appellant himself also told about the gun being brought to him by Lee Rogers, about fooling with it, and claimed that its dis-

charge was accidental. This statement was evidently of use by the State in showing motive and malice.

Bills Nos. 5 and 6 relate to the examination of the conduct of the appellant's witness Lee (Curly) Rogers in this: that it is shown that such witness and appellant, at nighttime, went to the home of a certain banker in Fort Worth and woke him up, and appellant withdrew $1,800.00 from a bank in order to keep his wife from tying this money up so appellant could not draw it out of the bank. The witness did testify that he did go to the banker's home at such time. He also had previously testified: "I am not a good close personal friend of his (the defendant) and trying to help him. I am not now and never was connected in business with him. I never had any business dealings with him." Again, the witness testified in answer to questions by appellant's attorney: "The defendant owed me some money at that time; he had come to me and borrowed some money, and that night or morning he paid me part of it. I could not say if there was any scheme or purpose or plan to defraud his mother-in-law or his wife out of any money there. I wouldn't know. I know he paid me money he had borrowed from me." Just prior to the questions and answers above outlined the witness had been propounded the following question: "Now you stated to the jury that you never had any business with this defendant. You remember when his wife sued him for divorce, right just about the time of his trouble with his mother-in-law, don't you?" It was also shown that while this appellant was in the hospital that this witness, at appellant's request, and in company with a Mr. Loudermilk, went to Rogers' home and got a pistol and brought the same into appellant's room, and Rogers was in the room when the pistol was fired therein. These transactions took place on the afternoon of March 30, the same day on which the alleged assault upon Mrs. Callahan occurred. We think the matters set forth in these bills were admissible as showing bias and prejudice upon the part of the witness.

No extraneous offense was involved in the evidence. Whether or not it was inflammatory would depend to some extent on the circumstances under which it was presented to the jury. It was a very tame incident in comparison to the things appellant admitted. He and his wife had been previously divorced, remarried, and she again was taking steps to dissolve the marriage relationship. That appellant should withdraw his money from the bank should not have created any surprise in the jury's mind, nor added even a tiny bit of fuel to the flame. Had they believed his story they would have acquitted him. Having ac-

cepted the evidence of his accusers as to the things that took place, they exhibited no prejudice against him in fixing the low penalty which was given. It appears that a stronger inference of wrongdoing might be drawn from the evidence on the subject as developed by his own attorneys than from that which the State brought out.

The facts relied upon by the State show that Mrs. Callahan, the complainig witness, was a grandmother, weighing 83 pounds; appellant, her son-in-law, weighed about 200 pounds. That she lived at the home of appellant and his wife, the family consisting of the wife, a daughter of appellant and his wife, and a child of Mrs. Callahan's son whom Mrs. Callahan was raising, Gloria Anne by name, twelve years old, a rodeo performer, trick rider and rope twirler. There had been domestic troubles between appellant and his wife, who divorced him five days after this alleged occurrence. They had been previously divorced and remarried in the previous November. It seems that the home in which this family was living was the separate property of Mrs. Tindall, and while the divorce was pending appellant had not been at such home for a week. About 9:15 at night appellant appeared at this home, and after demanding admittance, he broke the glass in the door and came in with two pistols in his hands and a cane hooked over his arm. The child Gloria Anne, who had gone to bed, jumped up and gave her grandmother a pistol, and then all the family, save Mrs. Callahan, ran out of the house, appellant's wife hiding behind a rose bush near the house. Appellant inquired relative to the whereabouts of his wife, which was not told him, and he went into her room and there saw his clothes packed, and he asked Mrs. Callahan what his wife was going to do with these clothes, and after receiving the anwer that she did not know, he began beating Mrs. Callahan over the head with a pistol. She threw up her arm to protect her head, and he struck her on the arm, breaking both bones therein. After having beaten her, he again asked her: "What is she (the wife) going to do with them (the clothes) now?" Mrs. Callahan then said: "She was going to send them over to your mother's." He then knocked her glasses off. He again began beating her, and despite her begging and showing him her broken arm, when she said: "Louis, you're killing me. You are going to kill me." He said: "God damn it, that's what I'm going to do with you. Killing you outright is too good for you. I'm going to kill you by degrees." He then took her outside the house to a car with some one in it, and Mrs. Callahan tried to get such person to take her to town. Appellant then said: "You get back in that house or I'll kill you." She then returned to the

house and appellant re-entered the house and kicked the gas stove to pieces and allowed the gas to escape. When called to his attention that it would kill Mrs. Callahan, he answered that that was what he wanted to do. He then picked up the witness' Bible and beat her over the head with it. She was in pain and told appellant that he had broken her arm, to look at it. He then struck the broken arm with his gun and said: "I want to make God damn sure it is broke." The grandmother then fainted, and when she recovered consciousness and caught hold of appellant, he said to her: "You old bitch, I thought you was dead." Finally the doctor, who had been phoned to by appellant, came but at first appellant refused to let him come in the house. When appellant phoned the doctor he said: "Doc, come out here and set this God damned old woman's arm. I've just broken it." While the doctor was setting her arm appellant tried to strike her four or five times. Finally he picked up the doctor's instrument kit and said: "God damn you, I'll just kill you with this." The doctor then said: "No, you won't. That's mine. Don't touch it any more." Appellant had a gun at such time. He then told the doctor that he didn't want to take any advantage of Mrs. Callahan; that he was willing to shoot it out with her; so he threw a gun over close to her while keeping another gun cocked and pointed at her. While the arm was being set some officers came to the door, and appellant went to meet them. Mrs. Callahan then ran and jumped out of the window, and she heard appellant say: "If you come another step farther, you are dead sons-of-bitches," and the officers came no farther. She also testified that while she was out of the house talking to the man in the car, appellant told her to go back in the house; that she turned and ran back towards the house and appellant shot at her three or four times, and ten days afterwards she saw holes in the ground near where her feet were that she took to be bullet holes.

The furniture in the house was practically demolished. When appellant came there the night of the trouble there was nothing the matter with it; the occupants of the house fled and left him in sole possession. The testimony shows that:

"The household was completely demolished, glass was in everything, where all the enlarged pictures in the home had been broken, and the electric light fixtures that cost nearly eight hundred dollars, and the sewing machine was demolished, the electric sweeper was demolished, the waffle irons demolished, and suitcases, practically all of our clothes were cut all to pieces and torn up, the electric refrigerator had been kicked and ruined, and all the food and stuff was thrown out on the floor, the

telephone had been jerked off the wall, torn up, and suitcases had been torn up, shoes had been ruined by one of each pair being cut up, I left my glasses there and I never could find them any more, and the venetian blinds were torn down."

The doctor corroborated a portion of Mrs. Callahan's statement relative to the attitude of appellant while the arm was being dressed; he told about appellant throwing the gun at Mrs. Callahan, and saying that he would give her the first shot and he would take the second. The doctor also said the prosecuting witness jumped through the window without waiting for the bandage to be completed upon her arm; that appellant accused the doctor of helping her out the window. He found some bruises on her hand, a bruise and cut on her forehead an inch and a half long, made with some blunt instrument; he took three or four stiches in that, and both bones in her arm were broken; there was blood on the floor in the bedroom. As to the wound on the head, he testified:

"The area of the top of the skull where I testified it appeared a blunt instrument had made the wound on Mrs. Callahan's head, in the head of a person like Mrs. Callahan, is a place where a blow could prove fatal. A blow could prove fatal on anyone's head. The character of blow made with such force that could break a person's bones, with a pistol, is such that, if made on the head, it might prove fatal."

It is true that appellant was in possession of three pistols, and had he so desired he could have shot Mrs. Callahan with any of the three, but that does not necessarily mean that he would therefore be restricted to the shooting with such pistols in order to have an intent to take her life. It does not necessarily mean that when he shot towards her as she was running in the darkness towards the house, he did not try and intend to hit her; his aim might have been bad, or the darkness may have hidden her. Then the often expressed desire, intent and threat to kill by degrees, coupled with the fearful beating that he gave her, should doubtless have some influence in determining his intent. Her escape through the window, and appellant's evident anger and upbraiding of the doctor for helping her, might have had some weight with the jury, showing that he had not utilized all the degrees towards killing her that he had determined upon. We think the statements of appellant relative to his intent, together with the brutality and ferocity of his continued attack upon this frail 83 pound woman, not only evidenced his malice, but his studied and determined intent to take her life. The jury were entitled to, and doubtless did, infer that

the blow upon this woman's head, sufficient to break both bones in her hand and cut into her head about an inch, would doubtless have crushed her skull had same not been impeded by the upraised arm, the doctor's testimony leaving the inference that without the shielding arm the blow on the head could have been a fatal blow.

Many lives have been unlawfully taken by violent and brutal assault such as this, and the violence and brutality have been utilized as showing the intent of the accused. In the case of Young v. State, 49 Tex. Cr. R. 208, 92 S. W. 841, the opinion says: "The indictment charges that appellant did unlawfully kill deceased by beating, bruising and wounding her with a blacksnake whip and stick and a hoe, and a hoe-handle, and a rock and a plank, and a board and a rope, and by kicking her with his foot and by stamping her with his foot, and by choking her with his hands. These allegations are amply proved by the evidence; and the facts show a systematic and continued infliction of unprecedented cruelty towards a helpless girl on the part of appellant."

It will be noted that the death penalty was inflicted therein for the use of no more deadly weapon than is found in the instant case. Many persons have been killed by mere choking, or being beaten by hands and fists. As we understand the law, intent does not always depend upon the weapon or means used to produce the injury; it can often be found in the mode and manner of the attack, and the purpose evidenced thereby. But words themselves are often potent in aiding the search for the intent, as well as the brutality and ferocity of the attack.

We think it is to be shown herein by words as well as acts that appellant made an assault upon this grandmother with intent to kill.

Appellant gave an entirely different version of this matter, which was not supported by the witnesses. The jury evidently placed no credence in his statement. That was their privilege.

We think this court was in error in its reversal of this cause. The State's motion for a rehearing is granted, the judgment of reversal is set aside, and the lower court's judgment is now affirmed.

ON APPELLANT'S MOTION FOR REHEARING.

DAVIDSON, Judge.

Appellant insists that the facts fail to show an intent on his part to kill the injured party. The effect of his contention is that, inasmuch as the instrument with which the injuries were inflicted was not a deadly weapon, and no serious bodily injury having been inflicted, evidence of an intent to kill is lacking.

In the case of Amnann v. State, 165 S. W. (2d) 744, in speaking of the sufficiency of the evidence to show an intent to kill in an assault to murder case, we said: "If the weapon used is not deadly, the intent to kill on the part of the accused may be ascertained from and shown by the surrounding facts and circumstances. If it is possible that death might have been inflicted by the weapon used, and if the accused intended thereby to take life by the use made thereof, the offense of assault with intent to murder is complete, even though the instrument used was not a deadly weapon."

The nature and character of the assault made by the appellant, the weapon used, his utterances in connection therewith, together with all the other facts in evidence, lead us to conclude that the rule stated is applicable and controlling here. It follows that we remain convinced that the facts were sufficient to support the jury's conclusion of an intent to kill on the part of appellant.

In calling attention to the fact that Bill of Exception No. 3 was in question and answer form, we did not intend thereby to convey the idea that the subject matter complained of in that bill of exception was not considered by the court, because Bills of Exception Nos. 2 and 7, which were considered, embodied the same question as presented by Bill of Exception No. 3. When Bills of Exception Nos. 2, 3 and 7 are considered together, the question presented for our determination is whether the State was justified in eliciting from appellant, upon cross-examination, the fact that his case was first postponed because he was sick in a hospital at Dallas, and that, on the day following, when he did not appear in court, his case was definitely postponed for trial, and that he was not tried until sometime thereafter. With reference to appellant's having been in a Fort Worth hotel on the day the case was definitely postponed, questions were propounded as to whether he left the hotel that day, to which he replied that he left his hotel room only once, to get something

to eat, and that he did not again leave his room until about 11:00 A. M. the following day. All of this testimony was objected to by appellant as being immaterial and prejudicial. If such testimony tended to show that appellant was wilfully and without justification or excuse, delaying the trial of his case, proof of such fact was admissible, under the rule relating to flight by an accused, as a circumstance showing guilt. On the other hand, if the testimony be susceptible of no such construction, then no injury was sustained by appellant, because the State did not, by any testimony, contradict what appellant said about the matter, there being no testimony before the jury that the appellant was not in fact ill on the occasions mentioned by him. The matter stood before the jury upon appellant's uncontradicted answers to the questions propounded. We remain convinced that Bills of Exception Nos. 2, 3 and 7 fail to reflect reversible error.

The bills of exception complaining of argument of State's counsel were not discussed originally. It is deemed sufficient to say that the argument complained of violated no statutory or mandatory rule. It related only to the question of punishment to be assessed in the event the jury found appellant guilty. Upon objection by appellant's counsel, the trial court promptly withdrew the argument from the jury's consideration, and instructed them not to consider the same. In view of the fact that the jury assessed the minimum punishment affixed for the offense for which they found appellant guilty, we are unable to see wherein he was prejudiced thereby.

We have again examined appellant's contention relative to the matter set forth in Bills of Exception Nos. 5 and 6, and remain of the opinion that the conclusion reached was correct. We see no necessity for further discussion.

Appellant's motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.