CECIL COLE V. STATE.

No. 25,649. May 14, 1952.
Rehearing Denied June 25, 1952.

Hon. H. T. Brown, Judge Presiding.

*George K. DuPuy*, Lufkin, for appellant.

*Ward R. Burke*, District Attorney, Lufkin, and *George P. Blackburn*, State's Attorney, Austin, for the state.

470

GRAVES, Presiding Judge.

This is a conviction for murder, with punishment assessed at confinement in the penitentiary for ninety-nine years.

The indictment consisted of multiple counts; only those counts were submitted to the jury which charge: (a) the murder, with malice, of Vessie Lee McAlister by striking and hitting her with a hatchet, and (b) the murder, with malice, of Vessie Lee McAllister by "driving an automobile, in which the said Vessie Lee McAlister was then and there riding, into and causing it to collide with a tree, thereby and therewith causing the body of her, the said Vessie Lee McAllister, to be crushed and bruised, and by such manner and means aforesaid, kill the said Vessie Lee McAlister."

The jury returned a general verdict, with no designation as to the count upon which guilt was predicated.

Under such circumstances, the conviction will be applied to the count or counts finding support in the evidence.

The offense was alleged to have been committed the early morning of May 27, 1951.

About two months prior, Constable Boren was requested by the deceased, Vessie Lee McAlister, a widow, to go to her home in Diboll to evict therefrom the appellant, who, the previous night had been intoxicated. The record is silent as to the relationship between them at that time.

On the night before the alleged homicide, appellant, in company with Wasson, went from his home in Angelina County across the river to Trinity County, where they visited beer taverns and indulged in drinking beer. Upon returning to Angelina County, appellant prevailed upon Wasson to drive him to the home of deceased. Arriving there, they found the deceased and Mrs. Taylor seated in the latter's automobile parked in front of the residence. Appellant's attempted entry into the car was thwarted by the closed windows and locked doors evidencing deceased's fear of him. He was ordered to leave and not return, and he and Wasson drove away. They returned, however, a short time later, and found the women still in the car, together with the witness George, who, in the meantime, had joined them. A controversy arose in which the women again ordered appellant and Wasson to leave, threatening to call the officers if they did

not do so. The men left and shortly thereafter appellant got out of the Wasson car a short distance from the home of deceased, stating at the time that he was going back. After Wasson and appellant left that time, Mrs. Taylor went home in her car. The witness George also left, but soon returned. Deceased and George then drove around in his car for about a half hour and returned to her home. Shortly afterward, appellant approached the car with a .22 rifle in his hand—which the evidence suggests he had taken from deceased's home. Appellant ordered both George and deceased to get out of the car, which they did. As George re-entered his car and drove away, he heard a shot fired from the direction of appellant and deceased. This occurred about 1:30 Sunday morning, May 27. The evidence indicates that the shot George heard was from the .22 rifle with which appellant shot deceased in the arms. Deceased and appellant then went into the house, where some character of struggle ensued between them. Appellant tied the hands of deceased behind her with a strong cord and tied some rags around her wounded arm.

About this time, the sixteen-year-old son of deceased, who lived with his mother, drove home in his mother's car. Deceased and appellant came out of the house and got into the automobile, appellant explaining to him that as his mother had been in an automobile accident it was necessary that they take her to the hospital at Lufkin. All three left in the automobile, with the son driving. Soon thereafter, appellant ordered the boy to drive to the home of his (appellant's) father, near the town of Homer on a farm-to-market road off the Lufkin highway. Arriving there, appellant and deceased got out of the car and went to the rear of the house. Upon their return, the journey was continued—purportedly to Lufkin. Before arriving at the highway, however, appellant ordered the boy to stop the car and get out. Refusing, a struggle followed between them — during which appellant threatened the boy with a hand axe and the rifle. At this, and deceased's urging him to do so for his own safety, the boy got out, and appellant drove off. The son then caught a ride to Lufkin, and reported the incident to the officers.

It appears that appellant drove a short distance up the main highway and turned off to the right toward the town of Huntington on a hard surfaced farm-to-market road. The hard surface, or pavement, ended on or near a curve in the road near the home of the witness Boyett, and continued on as a dirt highway toward the Angelina River—in the vicinity of which the car was wrecked. The witness testified that about three o'clock

on Sunday morning he was awakened by his wife, who told him of hearing an automobile traveling at high speed past their home and a crash soon thereafter. Boyett went to the scene of the crash, which was about seventy-five yards from the end of the paved curve and twelve to fourteen feet off the downgrade dirt portion of the road. He there found a Chevrolet automobile which had collided with and wrapped itself around a pine tree about sixteen inches in diameter, at a point behind the driver's seat and just in front of the left rear wheel. Appellant was outside, but near, the car. To witness's inquiry as to whether anyone was hurt, he replied: "No, I don't think none of them is." When Boyette suggested that he call an ambulance and get some help, appellant replied: "No, there's no need. She can get from under there." Appellant then said to deceased, "Come on and crawl out from under there," to which deceased replied in a weak voice, "I can't. My hands are fastened."

Boyett then left the scene to go to the home of Driver, who lived nearby, for his help in trying to remove deceased from the car. Returning together, they endeavored, unsuccessfully, to move the car. Witness testified that at that time he discovered that the deceased was dead, and so told appellant—who made no reply. The witness further testified that he smelled alcohol on appellant's breath, but would not say that he was drunk.

Boyett and Driver, leaving appellant at the site of the wreck, then went to the latter's home and notified peace officers. Upon their return, appellant had gone.

Soon thereafter, Sheriff Jones and the ambuance driver arrived. With the aid of a wrecker they were able to get the car loose from the tree and to extricate the body of deceased. Her hands were still tied behind her. The .22 rifle and an almost empty half-pint whisky bottle were found in the car. Some ten feet from the tree there was found what is referred to as a hand axe or hatchet, described as a single-blade white-handled hatchet about fourteen inches long, with a part of the eye of the hatchet broken. There was evidence that this hatchet had been stolen from the witness Burnett. The hatchet was offered in evidence. It is significant to note that in describing it no mention is made of any blood stains thereon, nor are there other physical facts tending to show that it was the weapon with which the injuries were inflicted.

An examination of the body of deceased revealed an abrasion

about the size of a silver dollar over her right eye, under which there was a definite depressed skull fracture and several minor abrasions about her face, head, and neck; her chest showed multiple scratches and abrasions and also there were several abrasions and scratches on the left hip. The fourth and ninth ribs on the left side were fractured. The gunshot wound in her right arm indicated that it had been inflicted with a gun of small caliber at close range. There were cord markings about both wrists, and her hands were found tied behind her after her death.

The physician who made the examination expressed the opinion that death resulted from the injury to the head or the injuries to the chest. He expressed the opinion that the head injury could have been inflicted with a blunt instrument, such as a hatchet, by using it "broadside." He expressed the further opinion that the injury could have been received as a result of the automobile wreck.

Appellant was, without resistance, taken into custody at Huntington on Sunday afternoon—disheveled, his face strained from lack of sleep, his clothing bloody. Other than a superficial cut on his head and minor bruises and scratches, he was unhurt.

Appellant did not testify.

The case was submitted to the jury upon the law of murder with and without malice and of negligent homicide.

In submitting murder with malice, of which offense appellant was convicted, the trial court instructed the jury to the effect that appellant would be guilty (a) if he, with malice aforethought, killed the deceased by striking her with a hatchet, or (b) if he, with malice aforethought, killed deceased by driving an automobile in which the deceased was riding and causing it to collide with a tree.

In neither instance did the court require a finding by the jury of an intent to kill on the part of appellant.

A specific intent to kill is not in every case essential to support a conviction of murder. See Wharton on Homicide (3rd Ed.), par. 87; Walker v. State, 28 Tex. App. 503, 13 S. W. 860; Keaton v. State, 41 Tex. Cr. R. 621, 57 S. W. 1125; Tindall v. State, 146 Tex. Cr. R. 245; 172 S. W. (2d) 328; Cockrill v. State, 135 Tex. Cr. R. 218, 117 S. W. (2d) 1105.

We think the case of Whiteside v. State, second trial, 115 Tex. Cr. R. 274, 29 S. W. (2d) 399, would be especially in point herein. In that case, the accused was charged with having threatened his wife, who was in the upstairs of the building, by menaces on his part towards her, causing her to be overcome by hysteria; she jumped from the window of her own volition and fell and received injuries from which she died. In that case, we held:

"By exception to the charge appellant advanced the claim and here urges that there should have been an instruction to the jury although the appellant threatened the deceased and made an assault upon her which caused her to jump from the window and receive the injuries resulting in her death, he would not be guilty of murder unless at the time of the assault he had a specific intent to kill the deceased. The theory upon which the court dealt with the subject was, in substance, that if the appellant, with malice aforethought, by threatening words and gestures terrorized and frightened the deceased and caused her to have a well-grounded apprehension that her life was then in danger at the hands of the appellant and that said alleged conduct was reasonably calculated to and did produce in her mind a condition of terror and fright and the well-grounded belief that she was about to be killed by the appellant, and that in attempting to make her escape by jumping through the window she lost her life—a verdict of guilty would be justified. Article 1206, P.C., characterizes the results thus brought about as homicide. The acts done or words spoken in such case might be with or without malice and under our present murder statute the punishment for the resultant homicide be thus determined. If, as in this case, malice be appropriately averred and correctly submitted in the charge, the jury might conclude on the facts that in what the accused did and said there was the intent that seriously bodily harm or death should result."

In other words, the opinion is expressed that it was not necessary to charge on the specific intent to kill herein for two reasons: first, that it is not called for in such a case as this because of the preceding acts, such as the shooting of this deceased in the arm, the choking of her, the tying of her hands behind her and forcing her to get in an automobile and travel thus handicapped with appellant, the language that he used to her, the traveling in a direction contrary to carrying her to a hospital, as her son testified; and all of these matters taken together would evidence the fact that he had the intent to do an unlawful act insofar as the deceased was concerned; that the carrying out of this un-

lawful intent, carrying her with her hands bound in an automobile at a high rate of speed and his treatment of this woman while he had her in his possession, would evidence the fact of his having an intent to take her life.

Again, if a charge on intent to kill was demanded by the facts herein shown, then we think the appellant received more than he was entitled to under the law in that the court charged on an accidental killing, and if the jury believed, or had a reasonable doubt of the fact, that this death occurred by virtue of an accident, then they should acquit him of the crime of murder.

We therefore think that the jury was warranted in finding that appellant had tied the deceased and was on his way to some place to carry out his threat to kill her. His plan to do so was interrupted by the collision which completed the act he had engaged himself in doing before he reached that spot and carried out the murder in the manner planned. Another and intervening agency of death completed his crime.

The only conceivable defense relied upon by him was that she was killed by accident. The jury was charged on that issue that if she was killed by accident, they should find appellant not guilty of murder. This charge was on the ultimate issue and inclusive of the question of intent, which the court refused to charge on.

We think such charge submitted the only defense that could be found by the court upon his part, he not having taken the stand and offered no witness relative to the transaction.

Complaint is further made of misconduct of the jury in that one member of the jury, while the case was being tried and the testimony had been taken for one day, was informed that his daughter had been the victim of an attack of a trusty from the jail; and, under orders of the trial judge, the sheriff and his deputy and the daughter of the juror were brought up to where the jury were confined in their room; and the door opened, and the father of the young lady was brought to the door, all of the jurors being within his sight and within his hearing; and the juror's daughter informed him that she was all right, and she had been to see a doctor, and he said that she was all right; and she then retired, and the juror went back and lay down on his couch in company with all of the jurors; however, he did show some emotion at that time. The remaining jurors said that he seemed to be hurt, as though he had had some family trouble,

but the major portion of these jurors did not know what that trouble was. At all times the young lady was in sight of the jury, and he was in sight of the jury and just in or outside the door of the jury room, which was open at all times.

All of these persons testified, and each one of them made the statement that this had no effect upon them in any way in the trial of the instant case, that the juror whose daughter had been attacked was well contained and showed no emotion except immediately after his daughter had left; and none of them considered this matter as having any relationship whatsoever to the trial of the appellant; that no testimony was heard the balance of that day, but the next morning all the persons listened to the testimony, paying no attention to the fact that the juror's daughter had been attacked, and decided this case as best they knew how on the law and the facts.

We are familiar with the doctrine that where it is shown that a member of the jury had talked to some outside person, it becomes the duty of the state to show that no injury was done to the person on trial at any time. We think the state has discharged this duty in every way possible, the district judge himself having carefully counselled the officers, and the officers having carefully counselled the daughter, the daughter having maintained herself in calmness while talking to her father, that there is no element of injury shown.

We think this case has been properly tried and properly decided, and, under the circumstances shown, the judgment should be affirmed.

### ON MOTION FOR REHEARING.

MORRISON, Judge.

Appellant contends that we were in error in our original disposition of his contention concerning jury misconduct.

It has been the uniform holding of this court that, where a juror has a conversation with an unauthorized person out of the presence of the court, a presumption of injury is raised. 42 Texas Jurisprudence, Sec. 317, p. 399; Maxey v. State, 138 Tex. Cr. R. 27, 133 S. W. (2d) 785.

It has also been continuously held for many years that such is a rebuttable presumption, and it becomes the duty of the state

to call all parties to the conversation to testify on the motion for new trial to rebut such presumption by showing that the case was not discussed and that nothing was said which would prejudice the accused. Texas Jurisprudence, supra; Holder v. State, 140 Tex. Cr. R. 55, 143 S. W. (2d) 613.

In the case at bar, all parties to the conversation, including all the members of the jury, testified, and it is conclusively shown that the case on trial was not discussed nor alluded to in any way.

The first requirement has clearly been met. We move now to a consideration of whether it is shown that appellant's case was not prejudiced by what was said.

A daughter of one of the jurors reported to him that she had been criminally assaulted; that she had been examined by a doctor; and that he had concluded that she had sustained no serious injury.

Naturally, the juror involved was upset by such news, but it does not necessarily follow that his being upset was injurious to appellant's case.

A fairly safe rule would be to say that, if the matter brought to the juror's attention while serving on the jury bore such similarity to the case on trial that it would reasonably be expected to influence him against the accused, then the verdict of such a jury cannot be allowed to stand. An excellent illustration of what can occur that will cause injury to the accused is found in Means v. State, 100 Tex. Cr. R. 1, 271 S. W. 613. There, the case involved was that of a Negro charged with killing a white man. While the case was in progress, the sheriff and his deputy went out to arrest a colored man for bootlegging. The suspect resisted arrest, killed the deputy sheriff, wounded the sheriff and was killed himself. After the jury had retired to consider their verdict, the bodies of the deputy sheriff and the colored man were brought and spread on the courthouse lawn just outside the jury room. A large crowd assembled and, within the hearing of the jury, loudly condemned Negroes generally for killing white men. There, we concluded that the incident was necessarily hurtful in the case of the accused then on trial.

Since there was no similarity between the case on trial and the matter brought to the juror's attention, we conclude that the

trial judge was warranted in finding that they were not so influenced.

Remaining convinced that we properly disposed of this cause originally, appellant's motion for rehearing is overruled.