# JUNE 22, 1938

## James K. Cockrell v. The State.

No. 19458.  Delivered April 6, 1938.
Rehearing denied June 22, 1938.

The opinion states the case.

*Lawrence L. Bruhl* and *Raymond O. Furr*, both of Llano, and *Stinson, Hair, Brooks & Duke*, of Abilene, for appellant.

*Carlos C. Ashley*, District Attorney, of Llano, and *Henry Crawford*, County Attorney, and *F. H. Hammond* and *Thos. C. Ferguson*, Special Counsel, all of Burnet, and *Lloyd W. Davidson*, State's Attorney, of Austin, for the State.

GRAVES, JUDGE.—This case is a conviction for murder with malice, and a penalty of forty-five years.

We deem a recital of a brief summary of the facts to be necessary.

The appellant, a young man of twenty-two years of age, lived at Lampasas, Texas. On Sunday, the 20th day of June, 1937, he was in company with a Mrs. Vernadine Brandon in a black sedan automobile, and had driven to Buchanan Dam on the Colorado River, later coming to Burnet about 6:45 o'clock. When he first appeared at a restaurant in Burnet he ordered a bottle of beer, and the witness noticed that he had been drinking; after that he ordered another bottle of beer; his companion also seemed to have been drinking. Another witness, at about 7 o'clock, had two bottles of beer with appellant, and the lady

also had two bottles served to her. In leaving out of this latter place, the witness places appellant at the wheel of his car, and as appellant turned the corner coming out of State Highway No. 66 he turned it faster than most people do. It also seems that just as appellant came into the suburbs of the city of Burnet he and his companion each drank a bottle of beer, and as they got into the car to leave the beer joint appellant was heard to say: "Let me drive. I better try to sober up a little." It seems that the lady was driving the car when they first approached this tavern. We next find appellant at the cafe of Mrs. Bullion and Miss Brister, who both testify that about dark when leaving their cafe, on the west side of Highway 66, in the city of Burnet, the appellant backed his car onto the highway and across the same and into a ditch on the east side thereof, and then went up the highway in a northerly direction. It was dark and time to turn on the lights. Mr. White, who operates a store and filling station in Burnet on the corner where Highways 29 and 66 come together, testified that on the evening in question, at about 8 o'clock, he was out in front of his place servicing a car, and was watching the highway in order to intercept a certain coupe. He saw a black sedan, either a Ford or Chevrolet, going north at a speed of from fifty to sixty miles per hour, with a man driving. He first saw it about two hundred feet south of his place. When it got within about one hundred feet of his place it swerved across the road and ran within about twenty feet of his station, and then continued on in its journey north. He saw no other car near there traveling at that time.

Lee Bird testified that on Sunday, June 20, 1937, he and his wife and five children, who lived about a mile north of Burnet and a half mile west of Highway No. 66, had started to church in Burnet. They had walked east along a lane to Highway 66 and turned south. Two of the children were walking in front, he was carrying a baby, his wife walking by him, and two other children were right behind him and his wife. Ace Lee Bird, three years old, and Walter Bird, seven years old, were the ones behind. They were about eight feet west of the pavement,— none on the pavement. As witness reached the highway and turned south two or three steps, at about 8 o'clock, he saw the lights of a car coming down the road in his direction, his wife was by his side, and the two little boys maybe a half step behind him, all in the weed growth to the west. This car, traveling fast, suddenly turned to its left and came across the road right straight towards him. He stopped, and when he saw that the car continued to come towards him, he moved to his right; the car came within two feet of him and his wife, and struck

the children, Ace Lee and Walter Bird, with two distinct thuds, knocking them from fifteen to twenty feet to the west; one died immediately, and the other died in about three hours thereafter. After striking the children this car then crossed back to its right side, or the east side of the highway, without checking its speed to any appreciable extent and proceeded on north. A man was driving this car. There were no cars coming from the north at such time.

The appellant's statement was introduced in evidence, and his only defense appears therein. He states that after leaving Mrs. Bullion's cafe, that he proceeded out of town, and seemed to fall asleep, and upon awakening a car's lights were in his eyes, temporarily blinding him. That he turned west to his left in order to avoid this car, and he felt his car hit something. After proceeding about four hundred yards, he returned to the place where he hit something, and was informed that two children had been struck by an automobile, and that they had been taken to a hospital. He then proceeded to Lampasas by way of Bertram, Briggs and Lampasas, an out of the way route.

Appellant's first complaint is relative to the court's overruling his motion for a change of venue. It would appear that the court called a special term to convene on July 12, 1937, and appellant was indicted on July 15, 1937. The first count in the indictment charged him with malice aforethought killing Ace Lee Bird and Walter Bird by driving an automobile into said Ace Lee and Walter Bird. The second count charged that in the execution of an unlawful and felonious act, through mistake and accident, appellant drove an automobile against said children. The third count charged him with maliciously killing Walter Bird, and the fourth count charged the same thing as to Ace Lee Bird. The court then called a second special term to try such indictment on July 26, 1937.

The appellant duly presented his motion for a change of venue, supported by three compurgators. We also find a controverting affidavit of the district attorney alleging the lack of information upon the part of the compurgators, and asserting that a fair trial could be had in such county, and we find nothing further relative thereto. There seems to have been no testimony offered thereon, and the court must have decided the matter and refused the motion on the strength of the affidavit alone; at least we find no facts relative thereto in the record, nor incorporated in the bill of exceptions to the court's action. We can see no error presented relative to the court thus refusing the change of venue. See Branch's Ann. P. C., p. 181, Section

301. It would seem that there was no difficulty experienced in selecting a jury out of the first sixty men presented out of the venire of eighty summoned. We do not think the trial court abused his discretion in his ruling hereon. See Reis v. State, 95 S. W. (2d) 700, and cases there cited; Whiteside v. State, 29 S. W. (2d) 400; Bell v. State, 190 S. W. 732; Carlile v. State, 232 S. W. 822.

Appellant next complains of the court's action in overruling his motion for a continuance. He filed several supplements to his original motion until it is difficult to say where his first motion ends and subsequent motions begin, but the burden of all seems to be the fact that his sister Mrs. Gladys DuBois, who lived in Dallas, Texas, was forbidden by her doctor to travel for a period of two weeks on account of an operation she had recently undergone. The only evidence thereof is a letter from the doctor addressed to Mrs. DuBois, not sworn to, nor even addressed to the court, and included in such motion only. Suffice it to say, we have gathered from a perusal of all of them that appellant desired to prove by this witness that he was injured in an automobile wreck in February, 1937, in which his two companions were killed; that he had probably had a concussion of the brain; that he had at times a severe pain over his right eye; that he would have spells, sometimes two or three a week, when he would become listless, and seemed not to know with whom he was talking, and sometimes he would act as though he was talking to his two dead companions, and it is also stated therein that he (appellant) does not know that he had any such attack on the evening in question when these children were killed. He does say that he has learned that his woman companion, Mrs. Brandon, will testify that he had such an attack on the evening in question. He further alleges therein that if some of the State's witnesses take the stand, that his sister would be in the position to impeach them in the event they gave certain testimony contradictory of what they had stated to her when she had previously talked to them, especially naming the county attorney, Mr. Crawford, relative to the appellant's statement introduced herein. It is noted that all the latter portion of this motion as to impeaching testimony is highly speculative, and can not be appraised therefrom. The only witness mentioned, Mr. Crawford, did not testify at all, and, of course, if the lady had been present she could not have been used to impeach him. The motion for a new trial does not contain any affidavit from Mrs. DuBois showing what her testimony would have been. Had she been present the only testimony she could have given that now seems pertinent, in our

judgment, would have been relative to the purported recurring attacks of appellant, and this would not have had any appreciable weight unless he was suffering with such an attack at the time of the killing of the two children. Mrs. Brandon was present at such time, and her testimony was available to the appellant, but he did not use her. It seems to us that the failure to have the affidavit of Mrs. DuBois attached to the motion for a new trial militates strongly against the truth of such a willingness of her to give such testimony.

We quote from Judge HAWKINS' opinion in La Fitte v. State, 54 S. W. (2d) 133: "No affidavit of Mrs. La Fitte was attached to the motion for new trial stating that she would have in fact given the testimony expected from her. While such an affidavit may not be indispensable, its absence, unless accounted for, which was not done, may be considered by the court together with the evidence heard upon the trial and the circumstances of the case in determining whether the claimed absent testimony was probably true."

We are convinced that the trial court was within his discretion in overruling appellant's motion for a continuance.

The question that has caused us some concern is whether or not the appellant was guilty of acting with malice aforethought in the act herein charged against him. The court in a voluminous charge, covering ten pages of the record, covered every conceivable phase of the case that could have been raised by the testimony, and the main complaint relative thereto is directed at the portion of the charge which submits a killing, with malice, of the two children, under which count the jury convicted appellant.

In other words, has the jury the right to infer or imply malice under such a state of facts as are herein exhibited? That malice can either be express or implied is still the law in Texas, although the two degrees of murder have been eliminated, as such, and we have murder with malice and without malice only.

It was the State's theory that the appellant's actions, just before and at the time of the unfortunate tragedy that took the lives of the little boys, evidenced the fact that appellant was in search of thrills, and in his near intoxicated condition he was driving his car at a high rate of speed at and towards persons on and along said State highway in order to frighten them and watch them scramble out of the way. In other words, that he was exhibiting such a high degree of recklessness and disregard of the rights of others in such actions that the jury were justified in inferring and implying malice to his acts. That

he backed his car from a point near a cafe on the west side of the highway completely across the highway ninety feet wide, and into a ditch on the east side; that he then started north at a high rate of speed down such highway, inside the city of Burnet, past intersecting streets, swerving his car to the left at an intersection of another highway, coming within twenty feet of a filling station and parties standing there, swerving back at about sixty miles per hour to his right hand side of the unobstructed road, and in about four hundred yards doing the same thing, and striking and killing two innocent little boys,—might give the jury some substantial ground upon which to base their belief that he was possessed of a heart regardless of social duty and fatally bent on mischief. That such can be inferred from acts such as these, if they be true, seems to have been held by many courts throughout the Union.

We quote from American Jurisprudence, Vol. 5, p. 929: "If the driver of a motor vehicle should intentionally strike another with his car with intent to kill him, and should thereby kill him, it would be murder independently of statutes relating to the operation of motor vehicles. It is not however essential that there should have been an actual intent upon the part of the operator to kill the deceased. The necessary malice may be inferred or implied where the driver acts so recklessly or wantonly as to manifest a depravity of mind and disregard of human life, as when he drives an automobile in such a manner as to directly imperil human life and without regard for the presence of persons on a busy street; for example one who, when in an intoxicated condition, drove an automobile at a reckless speed along a principal street of a village, into collision with another car, which resulted in the death of its occupant, may be found guilty of murder in the second degree, which will charge the one responsible for his movements with guilt of a like offense."

In support of this text we find the case of State v. Trott, reported in 42 A. L. R., page 1114, from North Carolina: "Murder in the second degree, or murder at common law, is the unlawful killing of a human being with malice aforethought. Malice does not necessarily mean an actual intent to take human life. It may be inferential or implied, instead of positive, as when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life."

Mr. HUDDY on Automobiles, in his Seventh Edition, p. 993, says: "The act of a motorist may fall within the cases of murder in such a manner as to evince a depraved mind, as where one

voluntarily becomes intoxicated while driving a car, and then drives on the streets of a city at a high rate of speed, heedless of pedestrians or of his acts. To make a case of murder against a motorist exceeding the speed limit, it should appear that such conduct was directly perilous to human life, or that human life would probably be endangered thereby. Thus if one in charge of a car so operated it where he saw people on the street and in danger, and if he so operated his car where he knew it to be probable that people were in the way, malice may be implied."

In Goodman v. Commonwealth, 153 Va. 943, 151 S. E. 168, it was held: "When men while drunk or sober, drive automobiles along highways, and through crowded streets recklessly, the killing of human beings is a natural and probable result to be anticipated. When a homicide follows as a consequence of such conduct, a criminal intent is imputed to the offender, and he may be punished for his crime. The precise grade of such a homicide, whether murder or manslaughter, depends upon the facts of the particular case."

To the same effect is the case of Hyde v. State, (Alabama) 160 So. 237; also the case of Ware v. State, 47 Okla. Crim. Rep. 434, 288 Pac. 374; also State v. Harvell, 204 N. C. 32, 167 S. E. 459; and many other cases from other States of the Union.

In Texas we find the Banks case, 211 S. W. 217, as laying down a similar doctrine. The appellant, a negro, was charged with shooting into a moving train and killing a negro brakeman, whom he had never seen. He was awarded the death penalty, and the lamented Judge LATTIMORE said in that opinion:

"One who deliberately uses a deadly weapon in such reckless manner as to evince a heart regardless of social duty and fatally bent on mischief, as is shown by firing into a moving railroad train upon which human beings necessarily are, can not shield himself from the consequences of his acts by disclaiming malice. Malice may be toward a group of persons as well as toward an individual. It may exist without former grudges or antecedent menaces. The intentional doing of any wrongful act in such manner and under such circumstances as that the death of a human being may result therefrom is malice."

In the Whiteside case, 29 S. W. (2d) 403, it is said: "A specific intent to kill is not in every case essential to support a conviction of murder. See Wharton on Homicide, (3d ed.) Sec. 87; Walker v. State, 28 Texas App. 503, 13 S. W. 860; Keaton v. State, 41 Crim. Rep. 621, 57 S. W. 1125. If death result under

certain conditions the law regards it as murder aside from the intent."

In Walker v. State, supra, p. 505, we find the following quotation: "If a person intentionally inflicts serious bodily injury upon the person of another which may result in death, although the intent to kill may not exist, the law, if the act was prompted by malice and death ensues, holds him guilty of murder. * * * Indeed there are a number of cases where a killing would amount to murder, and yet the party did not intend to kill."

Under the circumstances of this case, if the jury accepted the State's theory and believed its witnesses, this appellant with such a reckless disregard of the rights of others, and especially those who happened to be on this Highway 66, and the streets of the city of Burnet, drove his car at a high and dangerous rate of speed close to and near to persons rightfully thereon, purposely, either for the purpose of frightening them or to exhibit his skill as a driver, the jury had a right to infer or imply malice to such acts, and to punish him accordingly. Malice is a condition of the mind, so the court said, which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from the acts committed or words spoken, and it seems to us that a person who had been proven to have taken five bottles of beer in about one hour just before the tragedy, who was admittedly not sober when he began drinking this beer, who drove out of town past city streets at sixty miles per hour, who swerved completely across a ninety foot highway to his left and crushed out the life of two innocent little boys, and then drove on away; who came back to find out what his acts had resulted in; who then spoke not a word but returned home by a circuitous route, releasing the wheel to another on the way, "turned the car over to his stepmother and went to bed,"—evidences a depraved nature, and such acts evidence wantonness and such a disregard for the rights of others, such a recklessness of action that the jury had the right therefrom to impute to his acts malice, and to punish him accordingly.

A person driving an automobile, who injures another by the wilful and negligent use of such automobile, thereby causing the death of such person, does not necessarily come under the provisions of the law denouncing negligent homicide.

Article 1149 of the Penal Code reads as follows:

"If any driver or operator of a motor vehicle or motorcycle upon the public highways of this State shall wilfully, or with negligence, as is defined in this title in the chapter on negligent

homicide, collide with or cause injury less than death to any person upon such highway, he shall be held guilty of aggravated assault and shall be punished accordingly unless such injuries result in death, in which event he shall be dealt with under the *general law of homicide.*"

We then quote from Article 1201, P. C., Chapter 11 on Homicide:

"Homicide is the destruction of the life of one human being by the act, agency, procurement or culpable omission of another."

Under the above quoted statutes it is clear that the State had the right, when death ensued, to prosecute this appellant under the general law governing homicides, and to prove, if possible, a killing with malice, as provided for in any other prosecution under the general law of homicide, and governed by the same rules. That the State discharged such burden by its proof, we are convinced, and it has shown from the facts here established an unlawful killing with malice.

We confess this case has given us much concern, and we acknowledge our obligation to State's counsel for a very exhaustive brief filed herein.

Believing that the appellant has had his legal rights, this judgment is affirmed.

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant was indicted at a (first) special term of the district court of Burnet County, which convened on July 12, 1937. He was tried at a (second) special term of said court which convened on July 26, 1937, after the first special term had closed. No question is raised respecting the validity of the call for or holding of either of said special terms. For the first time in the motion for rehearing appellant attempts to raise a question as to the regularity of selecting the grand jury which returned the indictment at the first special term and of the petit jurors or venire from which the jury was selected which tried appellant at the second special term. On the first day of the first special term the trial judge selected and impaneled a jury commission which selected the grand jury which returned the indictment. At the same time the trial judge called the second special term to convene on July 26th, and di-

rected the same jury commission to select petit jurors or venire for said second term.

There is no merit in the criticism of the manner of selecting and organizing the grand jury which returned the indictment. It appears to be in strict conformity with Article 1920, R. C. S.

We find it unnecessary to discuss the question attempted to be raised regarding the selection of the petit jurors or veniremen for the second special term. No such point was made in the trial court during the selection of the jury which tried appellant. No mention was made of such matter in the motion for new trial. The point was not even raised in the original submission of the case in this Court, and in the motion for rehearing for the first time complaint is heard regarding such matter. Even if perchance there might be any merit in the complaint it comes too late. Article 11, C. C. P., provides: "The defendant in a criminal prosecution for any offense may waive any right secured him by law except the right of a trial by a jury in a felony case when he enters a plea of not guilty." Acts 42d Legislature, page 65, Chap. 43. We quote from McMahon v. State, 17 Texas Crim. App. 321, in which Judge WHITE said the defendant "can waive every right except the right of trial by jury. * * * An acceptance of the jury by the accused is a waiver of the right to question its organization on motion for new trial or in arrest of judgment." In Hernandez v. State, 47 Texas Crim. Rep. 20, 81 S. W. 1210, it was said: "Questions in regard to the manner of selecting and impaneling jurors must be excepted to at the time of the action taken. It is too late to suggest it by motion for new trial except under certain contingencies, wherein the statute provides that certain class of jurors are incompetent under all circumstances."

Such has been the consistent holding of this Court. See Branch's Ann. Texas P. C., p. 271, Section 524; 4 Tex. Jur., p. 53, Section 34; Tinsley v. State, 52 Texas Crim. Rep. 91, 106 S. W. 347; Kinch v. State, 70 Texas Crim. Rep. 419, 156 S. W. 649; Lowe v. State, 88 Texas Crim. Rep. 316, 226 S. W. 674; Campbell v. State, 122 Texas Crim. Rep. 494, 56 S. W. (2d) 460; Cardena v. State, 94 Texas Crim. Rep. 436, 251 S. W. 225; Ellington v. State, 63 Texas Crim. Rep. 427, 140 S. W. 1101.

On motion for rehearing appellant again urges that the evidence does not support the jury's finding of a killing upon malice. This necessarily brings in review all of the testimony in the case. We have again carefully examined the statement of facts. The evidence was analyzed and set out in our original opinion and

a restatement of the same would serve no useful purpose. The trial court in every way possible made it clear to the jury that in no event could they convict appellant under the first count of the indictment in the absence of malice. The facts in cases like this are always troublesome, but we are not allowed to substitute our judgment for that of the jury, and should not disturb the verdict unless no facts are found to support it. We think there is evidence from which the jury might have concluded that appellant handled his car in such manner as evinced such reckless disregard of the lives of others as would support the inference of malice.

Entertaining such conviction, we feel impelled to overrule the motion for rehearing.