17343

The STATE, Respondent, v. BEN MOUZON and JOHN BRYANT, JR., Defendants, of whom Ben Mouzon is Appellant

(99 S. E. (2d) 672)

*Messrs. Edward V. Atkinson* and *Arthur H. Wilder,* of Sumter, *for Appellant,*

*Messrs. R. Kirk McLeod, Solicitor,* of Sumter, *and John G. Dinkins,* of Manning, *for respondent.*

August 27, 1957.

OXNER, Justice.

Between 7:00 and 8:00 P. M. on Saturday, June 2, 1956, Mrs. Margaret Allen Coker, a pedestrian, was struck and killed by a 1955 Chevrolet automobile. Ben Mouzon and John Bryant, Jr., both Negroes, were riding in the front seat, but there is a dispute as to which one was driving. Both

were indicted. Ben Mouzon was convicted of murder with recommendation to mercy and given a life sentence. John Bryant, Jr., was convicted of accessory after the fact of murder and sentenced to imprisonment for a term of five years. Only Ben Mouzon has appealed.

Appellant contends (1) that the evidence is insufficient to support the verdict; (2) that there was error in refusing a motion for a change of venue; (3) that an alleged confession by him was improperly admitted; (4) that the Court erred in allowing the testimony of his co-defendant, John Bryant, Jr., to be considered against him; (5) that the Court erred in permitting the jury to separate overnight on the last day of the trial; and (6) that there were certain erroneous instructions. These questions will be considered in the order stated.

The homicide occurred in the village of Alcolu, Clarendon County. The highway running through Alcolu is surface treated. The traveled portion is approximately 20 feet wide. In front of the business places the shoulders were also surface treated. At the point of the accident, the road was straight and there was nothing to obstruct the vision of a motorist for a distance of 500 feet or more in either direction. The testimony of two eyewitnesses was to the following effect:

The deceased, who lived in Alcolu, proceeded to cross the highway at an angle of about 45 degrees. When about halfway across she apparently noticed the Chevrolet car approaching. These witnesses estimated its speed at 70 to 80 miles an hour. The deceased·then ran across the remainder of the highway and was struck by the Chevrolet just as she had gotten off the traveled portion of the highway and onto the shoulder. They observed no effort on the part of the driver to avoid striking her. After the impact the driver almost lost control, applied his brakes and slowed down to about 20 miles an hour. He then looked back but never stopped. It was the opinion of these witnesses that the accident happened around 7:00 P. M. They said it was not dark enough to require a motorist to use his lights. At the time of

the accident there was no other traffic on this highway. The speed limit in Alcolu is 35 miles an hour.

The sheriff and a highway patrolman went immediately to the scene of the accident. They thought that it occurred around 7:45 P. M. The body of the deceased was found about 71 feet beyond the point of impact. These two officers saw fresh "brake" marks on the right side of the road, extending approximately 118 feet up to the point of the accident. It was their opinion that the driver applied his brakes for this distance before striking the deceased.

An hour or two after the accident other officers found the Chevrolet car abandoned on a highway in Sumter County near the homes of Mouzon and Bryant. The right front fender was "crumpled" and right headlight broken. Shortly thereafter both Mouzon and Bryant were arrested at their respective homes. About 9:30 P. M. the Sheriff of Clarendon County took these two men to the jail at Manning. Both appeared to be under the influence of intoxicants, Mouzon more so than Bryant. In talking to the sheriff, each claimed that the other was driving the car at the time of the accident. On the afternoon of the next day, Sunday, the sheriff placed these men together in a cell and left them for about an hour and a half. When they were taken out, Mouzon said that he would "take the blame." The sheriff warned him that he should not do so unless he was driving. According to the sheriff, Mouzon then stated that he was driving when the deceased was killed; that he was traveling about 45 miles an hour and did not stop because he was frightened. Throughout the interrogation Bryant denied that he was the driver when the accident occurred but admitted that he took over the wheel when they reached a point about a mile and a half from the scene.

We now turn to the testimony of Mouzon and Bryant. They were in agreement that the Chevrolet was owned by Mouzon's brother who had loaned it to him on the day of the accident; that during the early part of the afternoon, Mouzon picked up Bryant; that the two then drove in and

around Sumter, after which they went to Manning and called at numerous places; and that each drove at various times during the afternoon. They disagreed, however, as to the extent of their drinking. Mouzon said he became highly intoxicated while Bryant contended that they only consumed a small amount of beer and whiskey.

Mouzon, who is about 20 years of age, testified that at around 7:30 P. M. he went to sleep in the car with Bryant driving; that he knew nothing of the accident but does remember being awakened by a jolt, after which he went back to sleep; that a short distance from his home, Bryant awakened him and said that the car had stopped; and that with the assistance of Bryant, he walked to his home where he was shortly thereafter arrested and taken to the jail, along with Bryant. He further testified that when they were questioned by the sheriff that night and the next morning, each denied being the driver; that on Sunday afternoon the sheriff placed both of them together in a cell and told them "to make up your minds" as to who was driving; that Bryant then sought to induce him to assume the responsibility, stating that he had no driver's license and was already in trouble for killing one person and that the insurance would be no good if he (Bryant) was driving; and that about this time the sheriff, who apparently had overheard the conversation, walked up to the cell and told Bryant that if he was in trouble, "don't try to get this little boy in trouble" and told him (Mouzon) that he did not have to take the blame if he was not the driver. He said he then told the sheriff, "I will just take the blame."

Several witnesses for Mouzon corroborated his testimony that he was drunk both before leaving Manning and when placed in jail. One witness further testified that Bryant admitted to him at the jail that he was driving the car.

Bryant, who is 25 years old, gave the following version of the occurrence:

"Well when we was going through the Manning city limits, he (Mouzon) was driving fast. As soon as we got out

where these bridges was at, this big swamp, he start driving, you know, wobbly like, and I say look out, Ben, you going to hit the side of one of these bridges there, and when we got to the end where highway 301 goes across the railroad, he pull off on the dirt and asked me if I want to get out, and I said do you mean that? and he say make it light on yourself. I said well, I thought maybe I was, you know, after I say something, spoke to him about driving so reckless, that he would take heed and slow down on his driving, but when I got back in the car and close the door he took off at a high rate of speed again. And so we got up there on this curve, going to Alcolu. He went over on the dirt and these telegram post, I say you going to hit one of these telegram post, and he tell me he got the wheel, and I didn't say no more until we got almost up in Alcolu, and I see he had a speed too fast going in there, and I told him to slow down, and when this lady was walking side the road, the next thing I know, this white lady was in front of the car and I say Ben, there is a lady in front of the car, you going to hit her, and when he hit the lady I duck my head, and I say, what you going to do, you going to stop, and he say, I hit the lady? I say yes, you hit her.! And he say I am sorry, I am going home, and that is the last words he told me, he was going home."

In other portions of his testimony he stated that Mouzon was traveling at a speed of 70 or 80 miles an hour and did not apply his brakes before striking the deceased. He admitted that about a mile and a half from the scene of the accident they stopped and he took over the wheel.

A witness for Bryant testified that at the jail on Sunday afternoon after the accident, Mouzon admitted to his mother that he was the one who was driving.

It will be seen from the foregoing review of the testimony that there is a sharp conflict as to which of these men was driving at the time of the accident. Implicit in the verdict of the jury is a finding that it was Mouzon. It may be reasonably inferred from the testimony that while highly intoxicated, he was driving 70 or 80 miles an hour in a 35 mile

speed zone; that he ignored repeated requests by Bryant to slow down and drive carefully; that he made no effort to avoid the accident; and that knowing that he had hit the deceased, he failed to stop. While it is true that the officers said there were marks indicating the application of brakes before the point of impact, there is other testimony warranting a different conclusion.

We think the evidence was sufficient to sustain a verdict of murder. The conduct of the driver was such as to imperil human life. Although it may be fairly assumed there was no actual intent to kill or injure another, there is evidence of such recklessness and wantonness as to indicate a depravity of mind and disregard of human life, from which a jury could infer malice.

It was held in *State v. Heyward,* 197 S. C. 371, 15 S. E. (2d) 669, 671, that malice as an essential ingredient of murder does not necessarily import ill-will toward the individual injured, "but signifies rather a general malignant recklessess of the lives and safety of others, or a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief." It was held in *State v. Long,* 186 S. C. 439, 195 S. E. 624, 627, that the driving of an automobile on a public highway by a person while intoxicated is not only *malum prohibitum,* but *malum in se.* It was there further stated: "It is gross and culpable negligence for a drunken person to attempt to guide and operate an automobile upon a public highway, and one so doing, and occasioning injuries to another, causing death, may be guilty of murder or manslaughter, as the facts may determine."

The facts in a motor vehicle accident will rarely sustain a conviction of murder, since the element of malice is usually missing. While no decision of this Court has been called to our attention involving a verdict of murder growing out of the operation of an automobile, there are numerous cases from other jurisdictions upholding such a verdict. *State v. Trott,* 190 N. C. 674, 130 S. E. 627, 42 A. L. R. 1114;

*Cockrell v. State,* 135 Tex. Cr. R. 218, 117 S. W. (2d) 1105; *Berness v. State,* 38 Ala. App. 1, 83 So. (2d) 607, affirmed 263 Ala. 641, 83 So. (2d) 613; *Owen v. State,* 188 Tenn. 459, 221 S. W. (2d) 515; *Wells v. State,* 210 Ga. 422, 80 S. E. (2d) 153. See also 5 Am. Jur., Automobiles, Section 792.

In *State v. Trott, supra,* [190 N. C. 674, 130 S. E. 629] which is one of the leading cases on the subject, the Court said: "Murder in the second degree, or murder at common law, is the unlawful killing of a human being with malice aforethought. Malice does not necessarily mean an actual intent to take human life. It may be inferential or implied, instead of positive, as when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life." There was further quoted with approval from Huddy the following: "The act of a motorist may fall within the cases of murder in such a manner as to evince a depraved mind, as where one voluntarily becomes intoxicated while driving a car, and then drives on the streets of a city at a high rate of speed, heedless of pedestrians or of his acts."

In concluding our discussion of this phase of the case, it might not be amiss to give the trial Judge's view of the verdict. In refusing a motion for a new trial, he said: "I think the facts are abundantly sufficient to justify the verdict of murder. As a matter of fact the verdict is in accordance with the proper consideration of the evidence, and the jury has done a very fine job." He further stated, however, that if the jury had brought in a verdict carrying the death penalty, he would not have let it stand. While a sentence of life imprisonment may seem severe where there is no actual intent to kill or injure, such a sentence is mandatory under the statute where the jury returns a verdict of murder with recommendation to mercy.

We next consider whether the Court erred in refusing a motion by defendants for a change of venue. Ordinarily this would have been the first question to pass upon but we con-

cluded in the instant case that it might be better understood after a review of the testimony.

When the case was called for trial at the June, 1956, term of Court of Clarendon County, which convened about two weeks after the accident, counsel for the two defendants moved for a change of venue upon the ground that a fair and impartial trial could not be had in Clarendon County. The motion was heard upon certain affidavits and the testimony of the sheriff. Two of the attorneys for the defendants stated in their affidavits that from discussions had with numerous citizens in Clarendon County, they were convinced that their clients could not obtain a fair and impartial trial; that a number of these citizens had so informed them but declined to make affidavits either because they did not want to be of any aid to the defendants or for fear of the effect upon their social standing and business; that some of those interviewed expressed the opinions that the defendants should be electrocuted; that the deceased was a member of an influential and widely connected family in Clarendon County; that there was strong racial prejudice throughout the county because of the litigation relating to segregation in public schools; and that since all the attorneys for the defendants were members of the Sumter Bar, they endeavored to secure the services of a member of the Manning Bar to assist them in the trial of the caes but were unable to do so, although their clients were willing to pay a reasonable fee. These attorneys expressed the opinion that their inability to obtain local counsel was due to the prominence of the family of deceased and "the tension and prejudice against the defendants."

There was also introduced an affidavit of a Sumter Negro to the effect that at the request of counsel for the defendants he endeavored to procure affidavits from numerous Negroes in Clarendon County who had told him that the defendants could not obtain a fair and impartial trial but these Negroes declined to give affidavits for fear of a reprisal.

After introducing the foregoing affidavits the sheriff was sworn at the request of defendants' attorneys. He admitted

removing the defendants to the state penitentiary for safe keeping on June 4th. He said this was done as a matter of precaution after receiving certain information from a resident of Alcolu but denied knowledge of any threatened physical violence. He further testified that there was "no more talk than usual" in a case of this kind and expressed the opinion that the defendants could obtain a fair and impartial trial in Clarendon County.

The State introduced eleven affidavits by citizens of Clarendon County. Each affiant said he felt "sure" the defendants could obtain a fair and impartial trial. The solicitor stated that he could obtain many more affidavits to that effect but thought it advisable to confine them to a few from each section of the county.

At the conclusion of the hearing, Judge Eatmon, the presiding Judge, refused the motion for a change of venue but stated that since the hearing had been held in the presence of the jury panel, he would continue the case until the next term of court.

The case was again called for trial at the September, 1956, term over which Judge Griffith presided. The motion for change of venue was then renewed and heard by Judge Griffith at his Chambers in order not to prejudice the rights of defendants by anything that might be said. There were introduced in evidence the affidavits used at the June term of court, together with certain new affidavits by the same persons to the effect that the sentiment against the defendants had not changed. The only new matter brought out was a statement by defendants' counsel to the effect that a false rumor had been circulated throughout the county that they had been employed by, and their clients were members of, the National Association for the Advancement of Colored People, which they said would seriously prejudice their case. Judge Griffith overruled the motion. His reasons for doing so are not set out in the record.

Upon motion of the solicitor, all the jurors were placed on their *voir dire* and the usual questions propounded. The

record does not contain the *voir dire* examination but it does appear that there was no "challenge from defendants' counsel." It was further stated in oral argument by the solicitor that counsel for the defense did not exhaust their challenges.

Of considerable significance is the following observation and ruling made by the trial Judge in the absence of the jury, near the conclusion of the testimony:

"Gentlemen, at the commencement of this trial I asked counsel about keeping the jury together, and the defense counsel expressed a desire that they be kept together. At that time, especially in view of the motions for change of venue and continuance, I expected more interest to be shown in the trial than has been shown in the courtroom today. I have observed that there have been on more than forty white people in the courtroom at any time, and part of them I think were witnesses, and about a half dozen colored people. I don't see the interest that has been manifested here that would justify me in keeping this jury together over night unless there is some special reason that you can advance."

It is well settled that a motion for change of venue on the ground that an impartial jury cannot be obtained is addressed to the discretion of the Court which, of course, "is a judicial, and not an arbitrary, discretion." *State v. Jackson,* 110 S. C. 273, 96 S. E. 416. While in the instant case the trial Judge would have been fully justified in granting the motion, we cannot say his failure to do so constituted a clear abuse of discretion.

The motion was based largely on affidavits of defendants' counsel to the effect that after a thorough investigation, they were convinced that their clients could not obtain a fair and impartial trial. These are lawyers of ability and are held in the highest esteem. No one would question their sincerity but in a commendable zeal to protect every right of their clients, they could be mistaken in their conclusion. They aver in their affidavits that numerous citizens told them that a fair and impartial trial could not be had in Clarendon

County but refused to make affidavits to that effect. However, the record discloses no effort to subpoena any of these people. The following language of Mr. Chief Justice Blease in *State v. Rasor,* 168 S. C. 221, 167 S. E. 396, 399, 86 A. L. R. 1237, is applicable here: "While counsel stated that 'the citizens,' who had given him information, had refused to make affidavits, verifying the information obtained, there was no request that these citizens, who were unnamed, should be brought before the court and required to testify as to the information they had furnished. The court had the power to summon 'these citizens' before it for the purpose of proper examination, and, no doubt, if their names had been given, and a request for their examination in open court made, the presiding judge would have granted it."

It is further stated in these affidavits that a fair trial cannot be had because of strong racial prejudice existing in Clarendon County, due in part to the recent litigation pertaining to segregated schools. On this premise no Negro could get a fair trial in Clarendon County in any case where the alleged victim belonged to the White race. Experience in the courts of that county and other counties in South Carolina does not justify that conclusion.

As controverting the showing made by the defense, we have the testimony of the sheriff that the defendants could obtain a fair trial, and affidavits from eleven citizens residing in various parts of the county to the same effect. In addition, we have the statement of the trial Judge made near the conclusion of the testimony to the effect that not more than 40 White people, some of whom were witnesses, were in the courtroom at any time and that he did not think there was sufficient interest in the case to justify his continuing to keep the jury together. We attach considerable weight to this statement. It strongly negatives the contention of an aroused public sentiment. If there ever existed in Clarendon County any great interest in this case, it must have subsided prior to the trial in September. The trial Judge was on the scene and in a much better position than we to evaluate

the circumstances. We have here not only his conclusion that a fair trial could be had but also that of the resident Judge who doubtless was fully familiar with local conditions. Evidently the *voir dire* examination of the jurors disclosed no strong sentiment or prejudice for appellant's counsel did not include same in the record. As pointed out in *State v. Thomas,* 198 S. C. 519, 18 S. E. (2d) 369, such an examination ordinarily throws considerable light on the question of whether an impartial jury may be obtained.

The feature of the motion which has disturbed us most is the statement of one of appellant's counsel that he had been unsuccessful in securing a lawyer at Manning, the county seat of Clarendon County, to assist in the trial, although his clients were willing to pay a reasonable fee for such services. He states on information and belief that this was due to "the position of the family of the deceased and the tension and prejudice against the defendants in this cause," but does not disclose the source of such information or belief.

Although ordinarily the fact that a defendant is unable to retain local counsel is "a striking index of the condition of public sentiment," *State v. Gossett,* 117 S. C. 76, 108 S. E. 290, 294, 16 A. L. R. 1299, we think it would be going too far to hold that this necessitates in every case the granting of a motion to change venue. Much depends on the circumstances.

There are only about five practitioners at Manning. One was associated with the solicitor in this case. We are not definitely advised why the remaining four declined an offer of employment. It may have been for reasons other than appellant's claim of adverse public sentiment. There are several lawyers at Summerton in Clarendon County. There is no showing that they declined employment in this case. All the territory now embraced in Clarendon County was once a part of Sumter County or District. It is well known that Sumter lawyers frequently practice in Clarendon County. Manning is only 19 miles from Sumter.

After careful consideration, we are not convinced that appellant's inability to secure a Manning lawyer to assist in the case, when considered in connection with all the circumstances, compels a conclusion that the trial Judge abused his discretion in refusing the motion for a change of venue.

A refusal of motion to change the venue was upheld in the following cases although the showing of the defense was equally as strong if not stronger than that presented in the instant case: *State v. Francis,* 152 S. C. 17, 149 S. E. 348, 70 A. L. R. 1133; *State v. Thomas, supra,* 198 S. C. 519, 18 S. E. (2d) 369.

We have carefully considered *State v. Davis,* 138 S. C. 532, 137 S. E. 139, 140. It must be conceded that it has many features similar to those presented in the instant case but we do not think the showing here was as strong as in the *Davis case.* It appeared there that the homicide was followed by intense excitement; that for several days thereafter the defendant was hunted by bands of armed men who threatened him with death on sight; that the Governor, fearful of violence, ordered that defendant be held in the State Penitentiary for safekeeping; that the members of the deceased's family were working to influence sentiment for defendant's conviction; and that defendant was unable to secure local counsel, although able to pay for such services. In fact, it was conceded by the State that there had been a strong sentiment against the defendant. The only showing by the State consisted of six affidavits by citizens of Fairfield County to the effect that "in their judgment they thought that the defendant could obtain a fair and impartial trial in Fairfield county." In the instant case there was no showing of threatened physical violence, the statement of the trial Judge indicates that little public interest was manifested at the trial, and there was a substantial showing by the State that a fair trial could be obtained.

The third question is whether the Court erred in admitting the confession by appellant that he was driving the car at the time of the accident. It is con-

tended that the State failed to show that this confession was freely and voluntarily made. It is not contended that the sheriff threatened appellant or held out any inducement to him but it is argued that the record is silent as to what transpired during the hour and a half that appellant was in jail with his co-defendant. We think the question of whether the confession was freely and voluntarily made was properly submitted to the jury. Appellant admits that when he and Bryant were removed from the cell that the sheriff cautioned him not to take the blame unless he was the driver. He said he then told the sheriff, "I will just take the blame."

The next question is whether the Court erred in refusing to instruct the jury that the testimony of Bryant could not be considered against appellant. It is conceded that during the course of the trial the jury was instructed that any statement or confession made out of court by one of the defendants could not be considered against the other. But this principle does not extend to the testimony in court by a co-defendant or an accomplice. The testimony of Bryant was to be considered like that of any other witness. *State v. Cooler,* 112 S. C. 95, 98 S. E. 845. Of course, the credibility of his testimony was for the jury.

Error is assigned in inquiring of appellant's counsel near the conclusion of the testimony, in the presence of the jury, whether there was any objection to the jury's being permitted to separate and go home. It is argued that this was highly prejudicial. The record does not sustain the facts upon which this exception is based. The inquiry complained of was not made in the presence of the jury but during the absence of the jury. It was entirely within the discretion of the trial Judge as to whether he would continue to keep the jury together. *State v. Stewart,* 26 S. C. 125, 1 S. E. 468; *State v. Bates,* 87 S. C. 431, 69 S. E. 1075. There is no showing that appellant was prejudiced by the fact that the jury was permitted to disperse. It is not contended that there was any outside contact with any member of the jury.

There are several exceptions relating to the charge but the only portion complained of in appellant's brief is the following:

"I charge you in that connection, that no alleged confession or admission on the part of one defendant can be considered as affording any evidence whatever against the other defendant; nor should any such alleged confession or admission be considered as any evidence in the case as against the defendant making it, if you find that he did make it, unless the State has satisfied you beyond a reasonable doubt that the same was freely and voluntarily made, without any threats or inducements, or hope of reward or fear. In other words, before an alleged confession can be considered by the jury as evidence, it must not have been induced by promises nor extorted by fear, but must be free and voluntary in every respect, and then *it must be believed by the jury.*"

It is contended that the words we have italicized constituted an opinion as to the weight of the evidence and was a charge on the facts. While the phraseology used may not be a model for clarity, we do not think the charge is reasonably susceptible to the construction advanced by appellant. Obviously, the word "then" was used in the sense of "besides" or "in addition." We certainly can find no prejudicial error.

It should be further added that at the conclusion of the charge the jury was excused and counsel given an opportunity to make any exceptions or further requests. None was made by appellant.

Judgment affirmed.

STUKES, C. J., and Moss, J., concur.

TAYLOR and LEGGE, JJ., concur in result.

LEGGE, Justice (concurring in the result).

I limit my concurrence to the result, because, although otherwise in full accord with the opinion, I am unable to agree that there was no prejudicial error in that portion of

the charge wherein (according to the transcript, by which we are bound) the jury was instructed that "before an alleged confession can be considered by the jury as evidence it must not have been induced by promises nor extorted by fear, but must be free and voluntary in every respect, and *then it must be believed by the jury."* (Italics added.) The jury may well have understood, from the quoted language, that if they should find that the confession had been freely made they must accept all of the statements made therein as true. The language is certainly susceptible of such construction; so construed, it is an erroneous statement of the law, for even though the jury may accept the confession as having been freely made, they are the sole judges of its credibility, and may believe its statements *in toto,* or in part, or not at all. *State v. Miller,* 211 S. C. 306, 45 S. E. (2d) 23. But if the able trial judge did charge in the language quoted, it was the duty of counsel to call his attention to the error, which he undoubtedly would have corrected then and there. No timely objection or request for clarification having been made, appellant cannot now complain of it.

TAYLOR, J., concurs.