## 17714

STATE, Respondent, v. W. H. GRAHAM and James Holland, Appellants

(117 S. E. (2d) 147)

*Messrs. J. Reuben Long,* of Conway, and *P. H. McEachin,* of Florence, *for Appellants,*

*Richard G. Dusenbury, Esq., Solicitor,* of Florence, *for Respondent,*

■

November 15, 1960.

OXNER, Justice.

Appellants, W. H. Graham and James Holland, were convicted on a charge of willfully and feloniously setting fire to the Florence Hotel and its contents, the property of W. H. Graham, and of aiding, counseling and procuring the burning of said hotel and contents, with the intent to injure and defraud certain named insurance companies which had insured said property against loss or damage by fire. Graham was sentenced to imprisonment for a term of eighteen months and Holland for a term of twelve months.

We shall first discuss the exceptions relating to the sufficiency of the evidence to sustain the verdict. It is contended that the Court erred in refusing a motion by appellants for a directed verdict made when the State rested and again at the conclusion of all the testimony.

It may be well at the outset to state certain facts that seem to be undisputed. The Florence Hotel, a four-story building with about 80 rooms, is located in the main business district of the City of Florence. The Sanborn Hotel is immediately across the street. A fire station is only two blocks away. A policeman is regularly on duty in this area. The fire was discovered between 8:00 and 8:30 on the night of Tuesday, December 23, 1958. Some of the business places were still open.

This hotel was purchased in 1955 by Graham for $100,000.00. He says that he paid $20,000.00 cash, assumed a first mortgage of $50,000.00 and gave the seller a second note and mortgage for $30,000.00, and that at the time of the fire this mortgage indebtedness had been reduced to approximately $55,000.00. The building was insured against fire for $90,000.00 and the contents for $20,000.00. The hotel had been operated by Graham since he acquired it in

1955. Previously he had operated hotels at Marion, Conway, and Myrtle Beach. He and his wife had an apartment on the first floor. The employees consisted of a night clerk, two Negro maids and four Negro bellboys, one of whom was appellant James Holland. He had worked at hotels for Graham for a period of fourteen or fifteen years. Holland was the only colored employee who lived at the Florence Hotel. He had a room on the first floor near the rear of the building. On the night of the fire there were about seven permanent guests, all of whom had rooms on the second floor. There is some testimony, although it is not definite, that there was also a transient guest in the hotel that night. No one was occupying a room on either the third or the fourth floor. The hotel was equipped with a sprinkler system. When the heat reached a certain point, it would start operating which would cause the alarm bell to ring. This system was in good working order on the night of the fire.

The testimony offered by the State to establish the incendiary nature of the fire and appellants' connection with it may be briefly summarized as follows:

Although the alarm bell attached to the sprinkler system started ringing not later than 8:15 on the night of the fire, the Fire Department did not receive a call until approximately 8:25. The bell was heard by a fireman who was off duty and about a third of a block away. He immediately went to the hotel and found water seeping through the ceiling. Mrs. Graham was behind the desk and Graham was standing nearby. After this fireman talked to Mrs. Graham, she called the Fire Department. He then went up on the second floor where water was running from the ceilings and there was considerable smoke and saw appellant Holland "coming off the steps from the third floor." Holland told him that there was a man, Sam Wilson, in room 208 who was drunk and would not unlock the door. This fireman then knocked the door open with his shoulders, and found Wilson heavily intoxicated, standing in the middle of the room. He was reluctant to leave, stating that he had not done anything.

Finally, he was taken to the lobby by this fireman and Holland. The alarm was also heard by a policeman standing in front of the Sanborn Hotel. He immediately went across the street to the Florence Hotel where he saw smoke coming from a window. He went back to the Sanborn Hotel and after calling the Police Department, returned to the Florence Hotel where he saw Mrs. Graham working at the desk.

The fire trucks arrived within a minute or a minute and a half after receiving the call at 8:25. The firemen found one room on fire on the fourth floor and eleven or twelve rooms on fire on the third floor. All of these fires were disconnected. There was a definite odor of some petroleum product. The fire was brought under control in about an hour and a half. After that a careful examination was made of the building. It was found that holes about an inch in diameter had been bored with a brace and bit in the baseboard of the rooms and also a few holes were bored in the walls. Under these holes there were burned shavings. Burned matches were around various places where the fires started. There were stained places on the rugs. These spots had burned. A pair of gloves, similar to those worn at times by Holland, were found near the rear basement door about ten feet from his room. These gloves were wet and had "an oily smell." One of them was in a trash can and another outside of the trash can. Holland was the only bellboy who used gloves around the hotel. A cap from an oil can was found in a room on the fourth floor in which there had been no fire.

There had been guests in the rooms on the third and fourth floors on the previous Saturday night but none since. The two colored maids testified that the rooms on these floors were cleaned by them on Monday, the day before the fire, and that at that time there were no holes in the walls or shavings or matches on the floor. No odor was noted. The maids said after cleaning these rooms on Monday the doors were locked, as was usually done, and that they never had occasion to go back on either the third or the fourth floor. On the day of the fire they only cleaned the rooms on the second

floor and finished their work about 2:00 o'clock in the afternoon.

There were three keys on a string which the maids used in unlocking the hotel rooms. They got them from the linen room when they went to work and at the end of each day, returned them to the linen room and put the nightlatch on. Other than these and the regular keys used by the guests, the only means of unlocking the doors was by a passkey which was kept on a brass ring at the desk. It would unlock any of the rooms as well as the linen closet. An examination on the night of the fire disclosed that this passkey had been removed from the ring.

Graham seems to have had considerable trust in Holland who, as heretofore stated, had been in his employ for a number of years. Holland was the only one who had a key to his apartment. Several days after the fire Holland, who continued to work for Graham, was seen alone with him and his wife in the lobby of the hotel and when taken into custody about three weeks after the fire, was working for Graham's son-in-law in Horry County.

Holland and another bellboy worked at the hotel on the day shift. Their hours were from 8:00 in the morning until 8:00 at night. Quite frequently Holland stayed overtime. The bellboy who worked with him testified that they were together in the lobby during the afternoon before the fire but that Holland disappeared from the lobby about 7:00 o'clock that night and had not returned by 8:05 when this bellboy said he got off from work. About midnight after the fire the officers questioned Holland. He said that he was in the room asleep when the fire started and was awakened by water coming from the ceiling. He first stated that he had not been on the third floor in ninety days but later said that about 2:00 o'clock in the afternoon of the day of the fire, he went to the third floor to get some linen. Subsequently he said "he went up on the third floor to pick up some linen and the fire run him out."

Two of the bellboys worked at night, starting about 8:00 o'clock. One of them testified that when he came to work on the night of the fire, Graham instructed him: "You boys keep a close eye, front, because I am expecting a pretty good crowd to come in tonight." The State's testimony discloses no basis for this expectation.

Apparently Graham was in the lobby continuously for several hours before the fire was discovered. At least, there is no testimony to the contrary. However, it may be fairly inferred from the State's testimony that upon discovery of the fire, he was unconcerned and indifferent, making no effort to rescue any of his property or that of his guests. He remained calmly in the lobby.

On August 11, 1958, Graham offered to sell the hotel and furnishings to a business man in Marion for $77,000.00. About six months before the fire a Mr. Pate, who operated the Sanborn Hotel, contacted Graham about buying the Florence Hotel. Graham wanted $125,000.00 but later stated that he would take $100,000.00. These negotiations continued off and on, sometimes at the instigation of Graham and at other times at the instigation of Pate, until the day of the fire. On that day Pate offered Graham $90,000.00, $5,000.00 of which was to be paid in cash and the balance represented by mortgages. Graham declined the offer, stating that he thought he would wait until Pate secured more cash. During these negotiations, Graham indicated to Pate that he needed a substantial amount of cash to buy a motor court at Myrtle Beach. It appears that the monthly installment on the first mortgage on the hotel, due December 17, 1958, was not paid until December 29th, after the fire.

On August 20, 1958, a fire insurance agent in Florence discussed with Graham the question of insurance on the hotel. Graham had none at that time. The agent could not then get the full amount of the coverage desired by Graham but some insurance was written. Finally, in October the agent secured in four companies fire insurance of $90,000.00

on the building and $20,000.00 on the contents. Two or three weeks before the fire, Graham called this agent and indicated a desire to reduce the amount of insurance so as to cut down the premiums. However, nothing along this line was ever done.

Under the foregoing evidence did the Court err in refusing the motion for a directed verdict made at the conclusion of the State's case? The test to be applied in passing on such a motion is stated in *State v. Littlejohn,* 228 S. C. 324, 89 S. E. (2d) 924, 926, as follows:

"In considering whether the court below erred in not directing a verdict in favor of the defendant, we must view the foregoing testimony in the light most favorable to the State. *State v. Epes,* 209 S. C. 246, 39 S. E. (2d) 769. It must be remembered, too, that there is one test by which circumstantial evidence is to be measured by the jury in its deliberations, and quite another by which it is to be measured by the trial judge in his consideration of the accused's motion for a directed verdict. As to the former, it is necessary that every circumstance relied upon by the state be proven beyond a reasonable doubt; and that all of the circumstances so proven be consistent with each other and, taken together, point conclusively to the guilt of the accused to the exclusion of every other reasonable hypothesis. It is not sufficient that they create a probability, though a strong one; and if, assuming them to be true, they may be accounted for upon any reasonable hypothesis which does not include the guilt of the accused, the proof has failed. * * * Such test goes to the weight of the evidence, and is therefore to be applied by the jury in their consideration of it. *State v. Roddey,* 126 S. C. 499, 120 S. E. 359. But on a motion for direction of verdict, the trial judge is concerned with the existence or nonexistence of evidence, not with its weight; and, although he should not refuse to grant the motion where the evidence merely raises a suspicion that the accused is guilty, it is his duty to submit the case to the jury if there be any substantial evidence which reasonably tends to prove the guilt of the

accused, or from which his guilt may be fairly and logically deduced."

No serious question arises as to the proof of the corpus delicti. That the fire was of an incendiary nature admits of little doubt. The difficult question is whether there is sufficient evidence from which a jury could conclude that appellants were the incendiaries or procured the burning of the hotel. We think there is. It could be reasonably inferred that this was an inside job; that an outsider would not have had access to these rooms which had been left securely locked; that the incendiary used the passkey from the desk in unlocking the doors; that this passkey was secured by someone working at the hotel; and that such person had knowledge of the fact that the rooms on the third and fourth floors were unoccupied. Both of the colored maids and all of the bellboys except Holland testified for the State and if their testimony is believed, they had no connection with the fire. The hotel was heavily mortgaged and the evidence warrants a conclusion that it was overinsured. There was an unexplained delay on the part of Graham and his wife in calling the Fire Department. In fact, no call was made until requested by the off-duty fireman. After Mr. and Mrs. Graham knew the hotel was on fire, they exhibited no excitement and remained in the lobby apparently indifferent to the consequences. Graham seemed to be anxious that the bellboys remain in front. Holland was his trusted employee. He had known him for a long time and kept him in his employ after the fire. Holland disappeared from the lobby about an hour before the fire was discovered. That night some gloves similar to those worn by him were found at the rear of the building near his room. They were wet and had an "oily smell." After the fire Holland made false statements as to his whereabouts when it started and conflicting statements as to when he had last been above the second floor.

Graham is the only person who had a motive to burn the hotel. There is some suggestion by appellants' counsel that Sam Wilson had a motive. They say that he had previously

been employed by Graham and fired. But there is no evidence that he had any animosity toward Graham. In fact, the evidence shows that he was so heavily intoxicated that it is very unlikely that he could have bored the holes in the rooms and set all these fires. Apart from this, there is the improbability that one living in a hotel would set it on fire and then lock himself in his room and refuse to open the door. Nor is there any substantial evidence that any outsider was seen that day around the hotel who had an opportunity to set it afire. It is true that one of the bellboys testified that about 3:30 that afernoon a stranger inquired about a rest room and was taken up on the elevator to the third floor but according to the testimony of this bellboy, the stranger remained on the third floor only a minute and was taken back on the elevator to the lobby. Of course, someone could have entered from the rear of the hotel and gone up the back stairway or the fire escape, but to have done this job he would have had to have taken with him a brace and bit and a key to unlock the doors of the rooms.

While the evidence for the defense contradicts in many particulars that offered by the State, making factual issues for the jury, there was no error in refusing the motion for a directed verdict made at the conclusion of all the testimony. A number of witnesses for appellants testified that for two or three hours prior to the fire, neither Holland nor Graham was out of the lobby for any appreciable length of time. Holland denied any connection with the fire. He said that he had never owned or used the gloves found at the rear door of the hotel. He denied making the statements attributed to him by the officers. Mrs. Graham said that Holland never had possession of the passkey on the day of the fire and that this key remained on the ring until three or four weeks after the fire, at which time the hotel was closed and she took the key off the ring so she could put it in her pocketbook. She testified that her husband, who was in front of the hotel when the bell started ringing, came in the lobby and asked her to call the Fire Department, which she did, and that a

little later some person came in the lobby and ran upstairs and when he came down also asked her to call the Fire Department, whereupon she made a second call. After this was done, she says that she started calling the rooms of the guests on the second floor so as to notify them of the fire. Graham denied telling one of the bellboys on the night of the fire to stay in front as he was expecting a big crowd, stating that the only instruction along this line was a general one to all the bellboys that one of them should always stay in front of the hotel to meet the guests. He denied offering to take $77,000.00 for the hotel in August. He testified that since acquiring it he had renovated the rooms at a cost of approximately $25,000.00, and that he valued the hotel at $125,000.00 or $130,000.00. He said that he was in the lobby with some friends looking at television for some time before the fire, after which he and a friend, who was a part time clerk at the hotel, walked out in front. In a few minutes they heard the bell. After the bell had been ringing for about five minutes, he and his friend went to the place where the bell was located and saw water running down. He said he then went in the lobby and told Mrs. Graham to call the Fire Department. He corroborated the testimony of Mrs. Graham that the key was not taken off the ring until about three weeks after the fire. He admitted on cross examination that business at the hotel was only fair and was "dropping down." He also admitted that after the Fire Department was called, he did nothing except stand or sit in the lobby. The following is taken from his testimony on cross examination:

"Q. You saw some of that water coming down in the lobby? A. I knew it was water coming down.

"Q. What did you do? A. Nothing, except sit in the lobby."

Although several guests upon learning of the fire immediately went to the hotel and proceeded to their rooms on the second floor to save their effects, Graham did nothing. In fact, he never went up on the third floor to inspect the damage until the morning after the fire. He had no explana-

tion as to its origin and apparently did little to find out. He testified:

"Q. Do you know who set these fires? A. I don't.

"Q. Have you made any effort to find out? A. I employed Mr. Purvis (one of his attorneys) to try to find out for me.

"Q. Has Mr. Purvis found out? A. Not that I know of.

"Q. What all has Mr. Purvis done? A. I don't know."

In reply, the off-duty fireman said that when he reached the lobby Mrs. Graham told him that she had not called the Fire Department and he then requested her to do so. The dispatcher on duty at the Fire Department that night testified positively that his records only showed one call from Mrs. Graham.

If, as we have held, there was no error in denying a motion for a directed verdict made at the close of the State's testimony, there was none in refusing the motion made at the conclusion of all the testimony, for that of the defense only made factual issues for determination by the jury. Graham sought to explain the delay in giving the fire alarm by testimony to the effect that for some time prior to the fire, the sprinkler system was not functioning properly and on several occasions rang for several minutes when, in fact, there was no fire. But the sufficiency of this explanation was for the jury. The witnesses for the State testified that when these false alarms were made, the bell rang only momentarily or certainly not over a minute.

While perhaps neither of the circumstances heretofore related, standing alone, may have been sufficient to warrant an inference of guilt, when all are taken together, they reasonably point to that conclusion. Much stress is placed upon an observation of the trial Judge in passing on the motion for a directed verdict that he would be "worried" if he were on the jury. But any opinion of his as to the weight of the evidence did not require him to direct a verdict. He was not called upon to determine whether appellants were guilty. His function was solely to determine

whether the evidence was sufficient to require the submission of the case to the jury. He, of course, was empowered to set aside the verdict if he felt there had been a miscarriage of justice, but this he declined to do.

We now turn to other questions raised by the exceptions. It is argued that the Court erred in admitting confessions made by Holland under duress and in failing to give appropriate instructions as to the law of confessions. But we do not think the statements made by Holland while in the custody of the officers as to his whereabouts when the fire occurred and as to when he had last been on the third floor of the hotel can be properly classified as confessions. *State v. Pittman,* 137 S. C. 75, 134 S. E. 514, 520; *State v. Edwards,* 173 S. C. 161, 175 S. E. 277. In *State v. Pittman,* the Court quoted the following with approval: "A 'confession', in a legal sense, is restricted to an acknowledgement of guilt made by a person after an offense has been committed, and does not apply to a mere statement * * * of an independent fact from which such guilt may be inferred." Moreover, there is abundant testimony to the effect that these statements by Holland were freely and voluntarily made.

By two exceptions it is claimed that the Court erred in admitting in evidence the can cap and gloves. It is said that the cap was not connected in any way with either appellant and that the evidence was not sufficient to identify the gloves as having belonged to Holland or to show that they had any connection with the crime. Both of these articles were discovered by the firemen immediately after the fire. The can cap was admissible for whatever it might have been worth as a link in the chain of evidence tending to establish the corpus delicti. The fact that Holland had been seen wearing gloves similar to those introduced in evidence justified their admission. Of course, the weight to be given this circumstance was for the jury.

It is next contended that the trial Judge permitted the State on two occasions to attack the reputation of Graham. The first complaint is that Graham was

prejudiced in being asked whether the Fire Department had previously been called to the hotel. After Graham had testified that on several occasions the bell connected with the sprinkler system had given a false alarm, ringing for as long as two or three minutes, he was asked if on either of these occasions he had called the Fire Department. He replied in the negative but said he thought his employees had done so. We do not think this testimony tended to show previous fires at the hotel but only that the alarm bell had been giving trouble. There was no prejudice. Secondly, it is contended that the Court permitted testimony tending to show that Graham and his wife had lived in unlawful cohabitation at the hotel prior to their marriage. We do not think the testimony complained of warrants that inference. A policeman in testifying that he had known Mrs. Graham for a number of years stated that she came to work there before she and Graham were married. It would certainly be far-fetched to infer from this that there was any improper relations between these two people prior to their marriage.

Lastly, it is contended that the Court erred in refusing to change the venue upon the ground that appellants could not obtain a fair and impartial trial in Florence County. Counsel for appellants offered testimony and affidavits tending to show that beginning after the fire and continuing up to the time of the trial, newspaper accounts and statements made over the radio and television created an impression that appellants were guilty and strongly prejudiced them throughout the county. To controvert this showing, the State offered testimony and affidavits to the effect that there was no prejudice against appellants and that a fair and impartial trial could be had in Florence County. It is well settled that a motion for change of venue on the ground that an impartial jury cannot be obtained is addressed to the discretion of the court which, of course, is a judicial and not an arbitrary discretion. *State v. Mouzon,* 231 S. C. 655, 99 S. E. (2d) 672; *State v. Britt,* 235 S. C.

395, 111 S. E. (2d) 669. After careful consideration of the testimony and affidavits offered by the parties, we find no abuse of discretion.

Affirmed.

STUKES, C. J., and TAYLOR, LEGGE and MOSS, JJ., concur.